446

(141 P.3d 501)
No. 93,845

STATE OF KANSAS, *Appellee,* v. SEVERO GONZALES, *Appellant.*

Opinion filed August 25, 2006.

*Jean K. Gilles Phillips*, of Paul E. Wilson Defender Project, University of Kansas School of Law, of Lawrence, for appellant.

*James R. Watts*, county attorney, and *Phill Kline*, attorney general, for appellee.

Before MALONE, P.J., HILL, J., and BRAZIL, S.J.

Hill, J.: In this case we consider how far police can investigate after making a public safety stop of an automobile. These detentions are sometimes called community caretaking stops. In Kansas, police can stop vehicles for safety reasons. Because the Highway Patrol Trooper exceeded the scope of the safety stop here by asking routine investigative questions after his safety concerns were nullified and continued the detention to run a background check on the vehicle's occupants, we hold the subsequent search of the vehicle illegal and reverse Severo Gonzales' convictions for various drug offenses.

## Facts and Prior Proceedings

Because suppression motions are unique, the facts are crucial. We recite here what we have gleaned from the hearing transcripts and the videotape record from the patrol car.

On March 31, 2003, Severo Gonzales was riding northbound on the Kansas Turnpike in a 1994 Chevrolet pickup truck driven by his sister, Mary Jane Gonzales, when they were stopped by Master Trooper Jim Brockman of the Kansas Highway Patrol. Brockman was parked on the side of the turnpike in Butler County, checking the speed of traffic with radar. As he was parked there, he saw the pickup truck only from the passenger side but noticed a rear tire was bouncing around "a little bit."

Brockman pulled out from where his patrol car was parked and followed the pickup northbound, in part because of the problem with the truck's tire and in part because it was time for him to move anyway. Brockman did not initially turn on his vehicle's emergency lights as he followed the truck. The pickup was traveling slightly below the speed limit, and the trooper followed it for 5 miles and observed no traffic infractions. As he caught up to the truck, the trooper observed something protruding from the driver's side of the pickup. It turned out to be the open access hatch cover that allows access to the fuel tank cap for refueling. Brockman also noticed the driver's side rear tire was bouncing around "quite badly."

Brockman testified that during his tenure on the patrol he had seen a number of vehicles where drivers had forgotten to put on their gas caps or close the hatch cover before, so he stopped them as a matter of courtesy. Brockman stated he had a safety concern in this case because of the way the rear tire was bouncing around. He thought the tire may be unsafe. After observing these two items, Brockman turned on his emergency lights and stopped the vehicle. Turning on the emergency lights activates the patrol car's video recorder.

Trooper Brockman advised the driver and passenger the reasons for the stop and then shut the hatch cover over the gas cap. At this point, Brockman did not observe anything that he thought was illegal activity. Brockman asked the driver and passenger for their licenses and registration for the vehicle; Brockman also asked where they were going. The trooper had some doubts about the ownership of the vehicle and whether the Gonzaleses had proper possession of the pickup. At this point, Brockman asked the passenger, Severo Gonzales, to get out of the truck, and they both went back to the patrol car.

In the patrol car, Brockman discussed his concerns about the ownership of the vehicle with Gonzales. He also requested his dispatcher to run a "wants and warrants" and "triple I" check on Gonzales and his sister. While this was going on, Brockman examined the tire in question and decided the tire was safe. After another 9 minutes of questioning Gonzales and the driver, Trooper

Brockman gave Gonzales back the driver's licenses, registration, and other documents and told Gonzales he was free to leave. But in the same breath and before Gonzales could respond or get out of the patrol car, Brockman then asked Gonzales some additional questions.

Because of his concerns about the ownership of the pickup and doubts about Gonzales' plans in Kansas City, Brockman acted on this hunch and asked for consent from Gonzales to conduct a "quick search" of the truck for drugs, weapons, or other illegal substances. Gonzales agreed as long as it did not "take too long"; Brockman assured Gonzales it was not "going to take long." Brockman advised Gonzales he could stay in the patrol car and said the driver could stay in the truck; however, they should not move around.

Gonzales testified that he consented to Brockman conducting a quick search, anticipating Brockman would check out the luggage and the inside of the truck. He did not believe a "quick search" would include opening the hood, going through the side panels, or looking in the gas tank. Gonzales said he had been stopped on other occasions and those searches took about 5 minutes. Also, Gonzales thought the search was going on too long but did not believe he could say no to the search. Gonzales did not believe he could get out of the patrol car because the trooper might think he was trying to run and pull a gun on him.

In conducting the search, Brockman looked through the luggage found in the bed of the truck, looked under the hood and dash, inside the doors, and in the bed of the truck. He also listened to all of the tires with a stethoscope while pounding on them. After an approximate 17-minute search, Brockman had found nothing. The trooper then examined the interior of the gas tank on the pickup by extending a fiber optic scope down into the fuel tank. By using this tool, Brockman observed containers inside the fuel tank. At this point, Brockman gave *Miranda* warnings to the driver and Gonzales and told them that they were not free to leave. Brockman then decided to take the pickup to a repair facility in Emporia in order to drain and remove the fuel tank. Despite his earlier safety concerns, Brockman did not call a tow truck to tow the truck

to Emporia. Instead, the trooper had Mary Jane Gonzales drive the truck 38 miles to Emporia with Brockman following. Brockman advised the driver to proceed at the speed limit. Marijuana was found in the gas tank.

Gonzales, charged with various drug offenses, filed a motion to suppress the evidence from the vehicle search. At the conclusion of the suppression hearing, the trial court ruled that Gonzales' consent to search was not limited to location but rather to time. The court also found the 17-minute search did not exceed the consent. The court also found the officer sufficiently articulated a reasonable and legitimate reason to pull the car over and that it was a "perfectly valid stop."

Thereafter, Gonzales proceeded to a bench trial based upon stipulated facts. In the stipulation, Gonzales preserved his objections to the admission of the physical evidence and his statements. After a very cursory discussion of this waiver of the jury trial, the court found Gonzales guilty. Gonzales was ultimately given concurrent sentences of 15 months, 11 months, and 6 months but placed on standard probation for 18 months, subject to completing the program at the Labette Correctional Conservation Camp.

On appeal, Gonzales contends Trooper Brockman acted unlawfully in stopping his vehicle because the Constitution does not permit forcible stops for "courtesy" or "safety" reasons. Gonzales focuses on Brockman's testimony about a "courtesy stop" but also contends the Kansas cases recognizing a forcible "safety stop" violate constitutional principles.

We examine this case in three steps. First, we determine if the trooper was justified in initially stopping the pickup truck. Next, if the stop is valid, we decide if the officer exceeded his authority by starting an investigation and search. Finally, we look to the circumstances surrounding the defendant's consent to decide if it washed away the taint of an illegal search.

### Safety Stop Authorized

In Kansas, police officers can perform public safety stops only if the stops are based upon specific and articulable facts. *State v.*

*Vistuba,* 251 Kan. 821, 840 P.2d 511 (1992). We think the trooper had the authority to make the stop in this case.

## Standard of Review

This case requires us to review the holding of the trial court on a motion to suppress.

"When reviewing a motion to suppress evidence, the appellate court determines whether the factual underpinnings of the trial court's decision are supported by substantial competent evidence. However, the ultimate legal conclusion drawn from those facts is a legal question requiring the appellate court to apply a de novo standard of review. The appellate court does not reweigh the evidence. [Citation omitted.]" *State v. Green,* 32 Kan. App. 2d 789, 792, 89 P.3d 940, *rev. denied* 278 Kan. 849 (2004).

However, when the facts material to a trial court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review. *State v. Ramirez,* 278 Kan. 402, 404, 100 P.3d 94 (2004).

## Analysis

Kansas courts have organized encounters between police and citizens into four types: voluntary encounters, investigatory stops, public safety stops, and arrests. We deal here with a public safety stop. The concept of a lawful safety stop was first recognized by the Kansas Supreme Court in *Vistuba,* 251 Kan. 821. In that case, a deputy stopped a vehicle out of concern that the driver might be falling asleep and ultimately arrested the driver for driving under the influence of alcohol. The driver attacked the validity of the stop, and the district court dismissed the complaint. The Kansas Supreme Court reversed the dismissal, holding: "A civil or criminal infraction is not always essential to justify a vehicle stop. Safety reasons alone may justify the stop *if the safety reasons are based upon specific and articulable facts.*" (Emphasis added.) 251 Kan. 821, Syl ¶ 1.

On appeal, Gonzales challenges one of the premises of *Vistuba*—that a public safety or "community caretaking" stop can justify a *forcible* stop. Gonzales contends the authorities relied upon by *Vistuba* did not support a forcible stop. He points out that all

of those cases in fact dealt with inventory searches, not car stops. *Cady v. Dombrowski*, 413 U.S. 433, 37 L. Ed. 2d 706, 93 S. Ct. 2523 (1973), involved the impounding and inventory search of a damaged vehicle located on a roadway when the driver could not take action on his own. There, the Supreme Court concluded that the inventory search was part of a "community caretaking" function, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute. 413 U.S. at 441; see also *Colorado v. Bertine*, 479 U.S. 367, 93 L. Ed. 2d 739, 107 S. Ct. 738 (1987) (in absence of showing that police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation, evidence discovered during inventory search of defendant's van was admissible); *South Dakota v. Opperman*, 428 U.S. 364, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976) (routine inventory search of defendant's locked automobile, which had been lawfully impounded for multiple violations of municipal parking ordinances, did not involve an "unreasonable" search in violation of the Fourth Amendment to the United States Constitution).

But Kansas does not stand alone in the recognition of safety stops. See *State v. Maddox*, 137 Idaho 821, 824-26, 54 P.3d 464 (2002) (police may stop vehicle traveling off road on motorcycle trail under community caretaking function depending upon the circumstances; must be present need for assistance or other public interest to justify stop); *Apodaca v. State, Tax and Revenue Dept.*, 118 N.M. 624, 626, 884 P.2d 515 (1994) (police officer may stop a vehicle for a specific, articulable safety concern, even in the absence of reasonable suspicion that a violation of law has occurred or is occurring).

Other cases have recognized that the community caretaking function can justify a brief detention of an individual. See *United States v. Garner*, 416 F.3d 1208, 1214 (10th Cir. 2005) (directing person on foot to return and be examined by medical technicians justified under community caretaking function); *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993) (brief detention of motorist in traffic gridlock to explain dangerous conditions and advise him to stop honking his car horn was proper exercise of

function); *Com. v. Waters*, 20 Va. App. 285, 289-90, 456 S.E.2d 527 (1995) (the stop of a swaying, unsteady pedestrian is a permissible caretaking function).

In *State v. Acrey*, 148 Wash. 2d 738, 748-49, 64 P.3d 594 (2003), the court ruled that stopping a minor hanging around closed businesses after midnight until parents were contacted was reasonable:

"When police officers are engaged in noncriminal, noninvestigative 'community caretaking functions,' 'whether a particular stop is *reasonable* depends not on the presence of "probable cause" or "reasonable suspicion," but rather on a balancing of the competing interests involved in light of all the surrounding facts and circumstances.' [Citation omitted.]"

We decline Gonzales' invitation to ignore the *Vistuba* ruling. This court is duty bound to follow Kansas Supreme Court precedent unless there is some indication the court is departing from its previous position. See *State v. Beck*, 32 Kan. App. 2d 784, 788, 88 P.3d 1233, *rev. denied* 278 Kan. 847 (2004). *Vistuba* is compatible with all of the cases listed above.

Once safety stops are permitted, then there must be limits placed upon them; otherwise, any pretext could serve as a reason to stop. *Vistuba* requires that specific articulable facts establish the need for the stop. Unless a public safety stop is based upon specific and articulable facts, it could " 'emasculate the constitutional protection afforded a motorist's privacy under *Terry* [*v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)].' " *Nickelson v. Kansas Dept. of Revenue*, 33 Kan. App. 2d 359, 364, 102 P.3d 490 (2004) (citing *State v. Ludes*, 27 Kan. App. 2d 1030, 1035, 11 P.3d 72, *rev. denied* 270 Kan. 902 [2000]).

Here, Trooper Brockman testified that his reasons for the stop were because the hatch cover over the gas cap was open and the rear tire was bouncing either "a little bit" or "quite badly," depending upon which part of his testimony is considered. There is no dispute that the open hatch cover was not perceived as a safety problem; even Brockman referred to it as a "courtesy" to alert the driver to that condition. It was the bouncing tire that was the alleged safety concern. A review of the videotape, which started when Brockman activated his emergency lights and initiated the

stop, however, does not reflect any obvious problem with the rear tire.

In fact, a review of the videotape raises serious questions whether Brockman was truly concerned with the safety of the tire. When Brockman approached the truck, he said "hello" and advised the occupants that he stopped them because the hatch cover was open and their tire was bouncing. At this time, he closed the hatch. Then Brockman immediately began asking who owned the truck and asked for the occupants' driver's licenses. Quickly thereafter, Severo Gonzales (the passenger) was asked to step out of the truck. Brockman asked him to come back to the patrol car and then questioned him some more about the truck's ownership. The trooper asked the dispatcher to run "triple I's" on the occupants. Leaving Gonzales in the patrol car, the trooper returned to the truck and asked the driver if there were any weapons in the truck. Only after all that investigation was completed did the trooper finally look at the tire and notice it was bald in many spots and suggested to the driver that it should be replaced. The examination of the tire did not occur until at least 8 minutes into the stop.

We defer to the trial court's finding that there were specific, articulable facts to support a safety stop. We question, however, whether the extent of the detention exceeded the justification for the stop, rendering the seizure unlawful.

### Detention Exceeded Basis For the Stop

The State contends this court should not address this issue because Gonzales did not challenge the length of the detention to the trial court. The written suppression motion challenges both the "stop and detention" of Gonzales. Defense counsel also specifically elicited testimony from Master Trooper Brockman about what occurred during the stop prior to asking for consent to search. But it is true that the focus of argument at the hearing was the basis for the initial stop and not whether the scope of the detention exceeded its initial justification.

Ordinarily, issues—even constitutional issues—not raised before the trial court cannot be raised on appeal. *State v. Williams*, 275 Kan. 284, 288, 64 P.3d 353 (2003). There are several exceptions to

the rule that a new legal theory may not be asserted for the first time on appeal: (1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent a denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or that it assigned a wrong reason for its decision. *State v. Schroeder,* 279 Kan. 104, 116, 105 P.3d 1237 (2005). The facts here are essentially undisputed, and consideration of the theory is necessary to prevent the denial of fundamental rights. We will entertain the argument also because it is important for the liberty interests of the public.

Cases recognizing the public safety or community caretaking exception have consistently acknowledged that such actions should be scrutinized carefully so the protections of the Fourth Amendment are not emasculated. See *Nickelson,* 33 Kan. App. 2d at 364; *Ludes,* 27 Kan. App. 2d at 1035 (both addressing the scrutiny of the facts justifying the public safety stop).

Likewise, the courts have been strict in recognizing that, as with any other police encounter, the scope of the detention during a public safety stop cannot exceed the justifications for the stop. The Tenth Circuit Court of Appeals recognizes limits on such stops:

"Like an investigative detention for law enforcement purposes, such a community caretaking detention must be based upon " 'specific and articulable facts which . . . reasonably warrant [an] intrusion" into the individual's liberty.' [Citations omitted.]. Additionally, the government's interest must outweigh the individual's interest in being free from arbitrary governmental interference. [Citation omitted.] Finally, the detention must last no longer than is necessary to effectuate its purpose, and its scope must be carefully tailored to its underlying justification. See *Florida v. Royer,* 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). *Once the officer has completed the inquiry necessary to satisfy the purpose of the initial detention, he or she must allow the person to proceed unless the officer has a reasonable suspicion of criminal conduct.* [Citation omitted.]" (Emphasis added.) *Garner,* 416 F.3d at 1213.

A holding from Montana best articulates limitations that should apply to these situations when that court established a three-part analysis of such detentions:

"First, as long as there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating . . . the protections provided by the Fourth Amendment." *State v. Lovegren*, 310 Mont. 358, 366, 51 P.3d 471 (2002).

Using that test we examine Trooper Brockman's actions during the detention in this case. After following the vehicle for 5 miles at turnpike speeds, the Trooper had noticed no traffic infractions. His concern was for something sticking out from the side of the pickup and a bouncing rear tire. Therefore, he had objective, specific, articulable concerns, so he could make the stop. The trooper could have shut the hatch and examined the tire within a few minutes, thereby rendering assistance and mitigating the exposure of the occupants of the pickup to any peril. Then, having completed his public safety stop, the detention should have ceased. Instead of examining the tire immediately, Brockman began an investigative action immediately upon approaching the vehicle by asking about the ownership of the truck and asking for the occupants' driver's licenses. It is clear therefore that the stop exceeded the public safety reasons for the detention and became a seizure as contemplated by *Lovegren*.

*Cady* and *Vistuba* recognized that the public safety or community caretaking function was "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441; *Vistuba*, 251 Kan. at 824. Here the investigation began before the caretaking ever started.

Clearly, the encounter here was not voluntary because the truck was forcibly stopped by the use of the patrol car's emergency lights. See *State v. Morris*, 276 Kan. 11, 22-23, 72 P.3d 570 (2003) (activation of emergency lights is a show of authority that renders encounter involuntary). Likewise, under Kansas law, an encounter ceases to be consensual when an officer takes the individual's identification card back to the police car to run background checks.

*State v. Grace*, 28 Kan. App. 2d 452, 458, 17 P.3d 951, *rev. denied* 271 Kan. 1039 (2001). Furthermore, Gonzales was removed from the pickup, placed into the patrol car, and told not to move around.

The State argues that if the initial stop was justified, the officer can request a driver's license, vehicle registration, run a computer check, and even remove the driver from a vehicle and cites *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 54 L. Ed. 2d 331, 98 S. Ct. 330 (1977), and *State v. Schmitter*, 23 Kan. App. 2d 547, 933 P.2d 762 (1997), as support. But both *Mimms* and *Schmitter* involved traffic stops based on observed traffic infractions. These stops were held to be proper *investigative* stops justified under *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). See *Mimms*, 434 U.S. at 109; *Schmitter*, 23 Kan. App. 2d at 550-51.

A public safety stop is *not* for investigative purposes. Asking for information about the ownership of the truck and demanding and retaining the occupants' driver's licenses exceeded the justification for the stop. That justification was limited to an examination of the tire to determine if it was safe to continue driving and to alert the driver about the condition of the tire. Obtaining and retaining the occupants' driver's licenses, under the circumstances of this case, exceeded the legitimate bounds for a safety stop. See *State v. Page*, 140 Idaho 841, 844, 103 P.3d 454 (2004) (officer stopping pedestrian to check on well-being exceeded community caretaking function by taking pedestrian's driver's license and running a warrants check; retention of driver's license constituted a seizure); *People v. Gonzalez*, 204 Ill. 2d 220, 224, 789 N.E.2d 260 (2003) (officer not entitled to request identification from passenger stopped under community caretaking function where State failed to explain how request served a public safety function); *State v. DeArman*, 54 Wash. App. 621, 625, 774 P.2d 1247 (1989) (once it was clear to officer that motorist's car was not disabled and did not need assistance, officer had no reason to proceed with stop or request motorist's driver's license); *cf. City of Topeka v. Grabauskas*, 33 Kan. App. 2d 210, 217, 99 P.3d 1125 (2004) (police could approach and talk with female pedestrians based on community caretaking function in searching for runaway minor girls; however, community

caretaking function ended when officers determined pedestrians did not match descriptions of runaways).

When focused on a different type of police-public encounter, a voluntary encounter, a panel of this court held that permitting officers to retain licenses and run warrant checks turns a voluntary encounter into a detention. See *Grace*, 28 Kan. App. 2d at 458. If such is true in a voluntary encounter, it should equally apply in a public safety stop.

In this case, the State does not contend that Brockman had reasonable suspicion or probable cause to believe any crime had been committed until his search of the gas tank disclosed concealed items. Here, Trooper Brockman clearly exceeded the scope of a public safety stop by conducting an investigation rather than focusing on the safety issues that he used to justify his stop of the vehicle. To permit law enforcement officers to cite a safety issue and then permit a full investigation as would take place during a stop for a traffic infraction would effectively eliminate all protections of the Fourth Amendment.

We hold that Brockman exceeded the scope of the safety stop by asking investigative questions and continuing the detention to run a background check on the vehicle's occupants. Unless public safety stops are strictly limited to the safety concerns justifying the stop, there will be no disincentive for law enforcement officers to "find" a safety concern as a pretext for an investigative stop when there is no reasonable suspicion or probable cause.

### Defendant's Consent to Search Tainted

We do not believe that the trial court was asked to address this issue. But, as we stated before, if an issue involves only a question of law arising on proved or admitted facts and is finally determinative of the case or consideration of the point is necessary to serve the ends of justice or to prevent a denial of fundamental rights, an appellate court may consider the question. *Schroeder*, 279 Kan. at 116.

In Kansas, consent to search can remove the taint of prior illegal seizures. Here, the entire encounter between the defendant and the trooper was recorded on the videotape, and it is unlikely there

would have been any other evidence presented if the validity of the consent had been challenged to the trial court. If the trial court did not specifically apply the taint analysis to the consent, the appellate court is empowered to do so upon a sufficient record on appeal. *State v. Crowder*, 20 Kan. App. 2d 117, 122, 887 P.2d 698 (1994). Accordingly, we will proceed with our analysis.

Under Kansas law, consent to search, "removes the taint of a prior illegal seizure if it was voluntarily given under the totality of the circumstances." *State v. Wilson*, 30 Kan. App. 2d 100, 106, 39 P.3d 668, *rev. denied* 273 Kan. 1040 (2002). Factors to consider include " 'the proximity in time of the [illegal seizure] and the consent, intervening circumstances, and particularly the "purpose and flagrancy" of the officers' misconduct.' [Citation omitted.]" 30 Kan. App. 2d at 106 (quoting *Crowder*, 20 Kan. App. 2d at 122).

When an illegal detention precedes consent, however, the State must establish both the voluntariness of the consent and a break in the causal connection between the illegality and the consent. *State v. Kermoade*, 33 Kan. App. 2d 573, 581, 105 P.3d 730, *rev. denied* 279 Kan. 1009 (2005); *Wilson*, 30 Kan. App. 2d at 106.

The State cites *State v. Reason*, 263 Kan. 405, 951 P.2d 538 (1997), in support of its argument that Gonzales' consent was voluntary after Brockman informed Gonzales he was "free to go." In *Reason*, police officers approached a BMW in a parking lot with both doors open in the middle of the afternoon. They observed two men sleeping inside. After awakening and questioning the men, the police eventually told the driver he was free to go, but shortly after that, the police asked the driver for permission to search the BMW. The driver responded, "Sure."

The Kansas Supreme Court categorized this initial contact between the police and the driver in *Reason* as a "voluntary encounter." 263 Kan. at 412. The court determined the officers' initial detention of the two men and the scope and duration of the questioning was proper. 263 Kan. at 412-13. In analyzing whether the driver's consent to search the BMW was free and voluntary, the court noted the "free to go" signal was a factor in determining whether the driver objectively felt under police coercion at the time of the consent. Ultimately, the court found the driver's con-

sent to search the BMW was free and voluntary after considering all of the circumstances. 263 Kan. at 415-16.

*Reason* is distinguishable from the present case. In *Reason*, the court determined the scope and duration of the officers' initial questioning was proper. *Reason* did not involve a situation where consent was necessary to remove the taint of an illegal seizure. As the court stated in its analysis: "Here we are not dealing with an illegal traffic stop. . . . There is no taint to purge from the consent if there was no illegal detention." 263 Kan. at 409-10.

Here, as we have determined, Brockman's detention of Gonzales far exceeded the scope and purpose of the initial safety stop. Gonzales' detention was illegal. Thus, to remove the taint of the illegal detention, the State must establish both the voluntariness of Gonzales' consent and a break in the casual connection between the illegality and the consent. See *Kermoade*, 33 Kan. App. 2d at 581. While it is commendable that Brockman informed Gonzales he was free to go before attempting to obtain consent, this factor alone does not determine whether Gonzales' consent was "voluntarily given under the totality of the circumstances." See *Wilson*, 30 Kan. App. 2d at 106.

In this case, the record undisputably demonstrates that Trooper Brockman activated his emergency lights to stop the Gonzaleses' truck only for purported safety concerns. Without inspecting the unsafe tire, Brockman asked about the ownership of the vehicle and then asked for both occupants' driver's licenses and the vehicle registration. Almost immediately, Gonzales was asked to step out of the car and then to sit in the patrol car, separating him from his sister. After a warrants check returned negative, Brockman gave Gonzales back their licenses and registration and told Gonzales they were free to go. Although Brockman asked if Gonzales understood they were free to go, Gonzales was given no time to respond, as Brockman was already asking if he would answer a few more questions. Within less than a minute, Brockman was then asking for consent to search the vehicle. Gonzales had no opportunity to get out of the car before Brockman proceeded with his additional questions. Once consent had been obtained, the trooper told Gonzales not to move around.

Under these circumstances, a reasonable person would not feel free to leave as contemplated in *Kermoade*. There was no sufficient intervening time or event sufficient enough to purge the taint of the illegal detention here. No matter how the State wishes to whitewash this, it will not gleam in the sunlight. The trooper far exceeded the purpose of his public safety stop, and with no passage of time or intervening event, the questionable consent here did not remove the illegality of the detention.

Because we conclude Gonzales' consent was not voluntary under the circumstances, we do not need to address his claim that Brockman's actions exceeded the scope of the consent.

Reversed.