(213 P.3d 441)
No. 101,225

CITY OF SALINA, KANSAS, *Appellant*, v. TROY RAGNONI,
*Appellee*.

Opinion filed August
7, 2009.

*Jennifer L. Wyatt*, city prosecutor, for appellant.

*Andrew Couch*, of Kansas Legal Services, of Salina, and *Lowell C. Paul*, of the same office, of Topeka, for appellee.

Before RULON, C.J., GREENE and LEBEN, JJ.

GREENE, J.: The City of Salina appeals the district court's suppression of evidence resulting from a stop and verbal inquiries of Troy Ragnoni, arguing that the stop and inquiry by a law enforcement officer was a valid public safety stop. We agree and reverse the district court, vacate the order of suppression, and remand the case for further proceedings.

### *Factual and Procedural Background*

After Ragnoni's ex-wife reported to authorities that Ragnoni called and asked her to tell the kids goodbye for him, officers were dispatched to his home address and found nobody at home. An entry was then made on the department "hot sheet" and published to all officers at the beginning of every shift, which stated:

"7554 07/03/2007 1:24:44 ATL [ATTEMPT TO LOCATE] REF: SUICIDAL SUBJECT "Ragnoni, Troy Anthony W/M/010475/509/160/Bro/Brn/209 E. Minneapolis blu 89 GMC Jimmy, Ks. UUU310. Subj called ex-wife advised to 'tell the kids goodbye'. Was intox. Left res. Unk. Loc. Unk. Any weapons or means. [Incident No. 20]07-18285."

Based on department policy, a welfare concern regarding someone who has been reported to be suicidal remains on the "hot sheet" until the individual is either located and determined not to be suicidal or taken to a hospital for evaluation.

Three days later, Officer Chad McCary of the Salina Police Department reported for duty and was given a copy of the "hot sheet" that included the information about Ragnoni. The officer testified the department policy was that if he encountered the subject he was to contact him and determine whether he was suicidal. When Ragnoni drove past the officer in the 1989 GMC Jimmy, a vehicle tag check revealed this was indeed Ragnoni. The officer followed Ragnoni's vehicle to a driveway at a private residence, where Ragnoni and his three children exited the vehicle.

The officer then pulled up in front of this residence and called out to Ragnoni requesting his identity. When Ragnoni failed to respond, the officer contacted him, told him that he had been reported as suicidal, and stated that the officer was there to check on his welfare. Ragnoni confirmed his identity but denied he was suicidal. In the course of this short conversation, the officer observed indicators that Ragnoni was intoxicated, including slurred speech, bloodshot and watery eyes, slow behavioral responses, and the odor of alcohol on his breath. The officer then conducted a driving under the influence (DUI) investigation and thereafter arrested Ragnoni on suspicion of DUI. Ragnoni was subsequently charged with DUI and failure to submit to a breath test.

Ragnoni was convicted of both counts in municipal court, but he perfected an appeal to district court. Prior to trial in district court, Ragnoni moved to suppress the stop and all activities thereafter, arguing this was not a valid public safety stop. The district court agreed, concluding only that "a public safety contact was not justified by Officer McCary and the defendant's motion should be granted." The City of Salina perfects this interlocutory appeal.

### Standard of Review

An appellate court reviews the district court's decision on a motion to suppress evidence using a bifurcated standard. Without reweighing the evidence, the appellate court reviews the district court's findings to determine whether they are supported by substantial competent evidence. *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007). Because the City did not object to the sufficiency of the district court's findings, the trial court is presumed to have made the factual findings necessary to support its decision. See *State v. Gaither*, 283 Kan. 671, Syl. ¶ 5, 156 P.3d 602 (2007). The appellate court reviews the ultimate legal conclusion regarding the suppression of evidence using a de novo standard. *Woolverton*, 284 Kan. at 70.

### Did the District Court Err in Granting Ragnoni's Motion to Suppress?

The Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights guarantee " '[t]he

right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures.' " *State v. Moore*, 283 Kan. 344, 349, 154 P.3d 1 (2007). In determining if Fourth Amendment protections have been violated through police and citizen encounters, Kansas courts have organized such encounters into four types: voluntary encounters, investigatory stops, public safety stops, and arrests. *State v. Gonzales*, 36 Kan. App. 2d 446, 451, 141 P.3d 501 (2006). Both Ragnoni and the State agree that the determinative issue in this case is whether McCary's stop of Ragnoni was a valid public safety stop. The City does not contend that the encounter was a voluntary encounter or an investigatory stop or that the officer had any cause to arrest Ragnoni prior to the stop.

The concept of a lawful public safety stop was first recognized by the Kansas Supreme Court in *State v. Vistuba*, 251 Kan. 821, 840 P.2d 511 (1992). In Kansas, police officers can perform public safety stops only if the stops are based upon specific and articulable facts that indicate a concern for public safety before approaching an individual to check on his or her welfare. 251 Kan. at 824; *State v. Parker*, 282 Kan. 584, 588, 147 P.3d 115 (2006). "A civil or criminal infraction is not always essential to justify a vehicle stop. Safety reasons alone may justify the stop if the safety reasons are based upon *specific and articulable facts.*" (Emphasis added.) *Vistuba*, 251 Kan. 821, Syl. ¶ 1; see *City of Topeka v. Grabauskas*, 33 Kan. App. 2d 210, 214-19, 99 P.3d 1125 (2004). In fact, public safety stops should be totally divorced from the detection or investigation of a crime. *State v. Schuff*, 41 Kan. App. 2d 469, 473, 202 P.3d 743 (2009). Unless a public safety stop is based upon specific and articulable facts, the concept could "emasculate the constitutional protection afforded" by the Fourth Amendment. *State v. Ludes*, 27 Kan. App. 2d 1030, 1035, 11 P.3d 72, *rev. denied* 270 Kan. 902 (2000). For this reason, courts must employ careful scrutiny in applying the public safety rationale. *Schuff*, 41 Kan. App. 2d at 473.

Under the public safety concept, a police officer may stop a vehicle to ensure the safety of the occupant without a reasonable suspicion of criminal activity. See *Vistuba*, 251 Kan. at 824-25.

Often these stops are made after the officer has actually observed something to indicate a potential public safety risk. See, *e.g.*, *Vistuba*, 251 Kan. at 822, 824-25 (a deputy stopped a vehicle out of concern that the driver might be falling asleep); *Gonzales*, 36 Kan. App. 2d at 447-48, 450-54 (an officer testified to concern after seeing driver's "bouncy" rear tire and open hatch cover over fuel tank); *Nickelson v. Kansas Dept. of Revenue*, 33 Kan. App. 2d 359, 360, 364-65, 102 P.3d 490 (2004) (a Kansas Highway Patrol trooper saw a vehicle turn into a "farm plug" with no buildings, outbuildings, businesses, or residences in the area and turn off its lights); *State v. McPherson*, No. 100,072, unpublished opinion filed March 13, 2009 (an officer had an initial concern that the car might have broken down, which should have been set aside once the car moved and was parked in a parking lot).

Sometimes public safety stops are not based on officer observation but rather on tips from anonymous or known sources. See, *e.g.*, *Schuff*, 41 Kan. App. 2d at 470-71, 472-76 (an officer dispatched following a call from a woman expressing concern about seeing a car drive off the road near her neighborhood); *In re J.M.E.*, 38 Kan. App. 2d 229, 230-31, 233-34, 162 P.3d 835 (2007) (an officer was dispatched after a call from a resident reporting a car parked at the dead end of a road with its lights off); *Grabauskas*, 33 Kan. App. 2d at 216-19 (officers initiated contact with the defendant because they wanted to determine if she was a reported runaway); *State v. Tucker*, 19 Kan. App. 2d 920, 921-23, 927-32, 878 P.2d 855, *rev. denied* 255 Kan. 1007 (1994) (police received anonymous tip regarding a driver who appeared to be drunk, and officers were justified in pulling over a vehicle matching the description even without observing erratic driving because morning traffic was heavy).

Ragnoni argues on appeal this was not a valid public safety stop, specifically arguing that the articulable facts necessary to justify a public safety stop must indicate some *immediate* danger to the public or individual if the stop is not made. Ragnoni goes on to argue that if the City had believed there was immediate danger to Ragnoni, its actions were inconsistent with this belief as it only followed up once at his house, there was no evidence that the

department made any further immediate attempt to locate him after he was not at home, and it simply placed him on the "hot sheet."

We disagree. First, another panel of our court has recently held that it is unnecessary for the officer to observe an emergency or to perceive an immediate need for assistance in order to justify such a stop. See *Schuff*, 41 Kan. App. 2d at 476. Second, whether the peril might have been addressed more promptly by authorities is irrelevant to our inquiry; this is not the proper focus in determining the validity of the public safety stop.

Finally, we are unable and unwilling to fault the officer's conduct here. The "hot sheet" information was based on a reliable source, it indicated a genuine concern regarding Ragnoni's danger to himself or others, and it was coded by the department to consider Ragnoni a "suicidal subject." Only 3 days later upon encountering Ragnoni, the officer merely made contact, confirmed identity, and gave him the opportunity to address the suicidal allegation. This was a minimal intrusion; no further detention or questioning occurred prior to the officer advising Ragnoni that he was under investigation for DUI. Our review of the record reveals no pretext for this stop, nor does it reveal anything but genuine concern for the subject based exclusively on the information within the "hot sheet." The officer acted on specific and articulable facts indicating there was reason to suspect Ragnoni may have been in peril. See *Gonzales*, 36 Kan. App. 2d at 450-54.

The essence of the Fourth Amendment prohibition against unreasonable searches and seizures is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials by imposing a standard of reasonableness upon the exercise of those officials' discretion. *Delaware v. Prouse*, 440 U.S. 648, 653-54, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979); see *State v. Bennett*, 288 Kan. 86, 92, 200 P.3d 455 (2009). In balancing the public interest against the degree of intrusion, the United States Supreme Court has developed a three-factor test, requiring a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. *Brown v. Texas*, 443 U.S.

47, 50-51, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979); see *State v. Deskins*, 234 Kan. 529, 541, 673 P.2d 1174 (1983).

Applying this test, we believe the public concerns regarding safety and the need to contact and/or observe an alleged suicidal person are indeed grave and may often save the life of the subject and others. Here, the stop of Ragnoni within 3 days of the "attempt to locate" report while he was in the yard of a private residence to address these concerns clearly advanced the public interest, and the severity of interference was minimal given that the officer's encounter consisted of only a conversation restricted to those concerns and lasted only a few minutes until the officer gained reasonable suspicion that a crime may have been committed.

Community caretaking is an important aspect of law enforcement, and citizens expect law enforcement officers to take reasonable steps to follow through on genuine reports of concern or danger to protect the public interest and safety. Here, the officer did precisely that. He was justified to contact Ragnoni as he did; in fact, had he failed to make this contact and Ragnoni thereafter harmed himself or others, the public would have been quick to criticize. We respectfully disagree with the district court and hold this was a valid public safety stop. Suppression of the evidence was error. We reverse the district court, vacate the order of suppression, and remand the case for further proceedings.

Reversed and remanded.