NOT DESIGNATED FOR PUBLICATION

No. 119,956

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

RALPH WEAVER,
*Appellee*.


MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed May 17, 2019. Affirmed.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Adam D. Stolte*, of Stolte Law, LLC, of Overland Park, for appellee.

Before ARNOLD-BURGER, C.J., PIERRON and MALONE, JJ.

PER CURIAM: In this interlocutory appeal, the State seeks reversal of the district court's order suppressing evidence in a prosecution against Ralph Weaver for driving under the influence (DUI). The district court suppressed the evidence, finding that what began as a valid public safety stop became an unlawful detention when the officers began conducting a DUI investigation before the public safety stop had ended. For the reasons stated in this opinion, we affirm the district court's judgment.

1

On September 1, 2017, at about 3:30 p.m., Dennis Trent pulled up to an intersection in Johnson County on his way home from work. When the traffic light turned green, the cars in front of him drove around a vehicle stopped in the lane of traffic. As Trent did the same, he looked over at the stopped vehicle and saw Weaver in the driver's seat, "slumped over with his head resting on the steering wheel."

Trent pulled over in front of Weaver's vehicle and went to check on him. As he approached the vehicle, he shouted, "are you okay" and "do you need help," but Weaver did not respond. The driver's-side window of Weaver's vehicle was open a crack, and Trent knocked on the window and "slapped on the side of the car door," but Weaver still did not respond. Trent retrieved his phone and called 911, continuing to try to rouse Weaver. Trent saw that Weaver's car was in drive and he decided to see if he could reach in through the cracked window and unlock the door. As he was doing so, he could hear sirens approaching, and Weaver "snapped out of it."

Trent told Weaver that he had called 911 because Weaver was unconscious. Weaver replied that he was fine, just tired, and he needed to leave. Weaver started to pull back into traffic and, at that point, Deputy Sheriff Cory Neal arrived on the scene. Trent conveyed to Neal that Weaver was the individual about whom he had called 911. Neal, who also had experience as an EMT, pulled Weaver over to determine why he had passed out in his car. From his training, he believed "if you are passing out in the middle of the road, it could be a medical emergency, such as a diabetic or any number of things."

After both vehicles were stopped, Neal walked over to Weaver's vehicle and asked, "What seems to be the issue?" Weaver replied, "I was sitting there and—next thing you know—I was just sitting there and all of a sudden—and I'd had a late night and, you know, I was getting ready to go up and get cigarettes and I come back and that's what was

going on." When asked why people had reported that he was slumped over, Weaver replied that he "kind of napped a minute." Neal had no difficulty hearing Weaver, although he felt that Weaver's speech "appeared . . . a little slurred." Neal saw no open container of alcohol, nor did he smell any alcohol. He did notice that Weaver "appeared kind of sluggish, had bloodshot eyes, [and was] kind of slow to answer."

Neal then asked Weaver, "So have you been drinking today?" Weaver said he had not and, when Neal asked the last time he had a drink, Weaver said, "Probably last night." Neal asked if Weaver had a heart condition and Weaver said he did not, but he said he had a knee replaced and another knee that "needs to be replaced." Neal asked if Weaver had any conditions that would cause him to fall asleep during the day. Weaver said that he takes cyclobenzaprine, Meloxicam, oxycodone and OxyContin, all of which he had taken that morning. Even so, Weaver said he was "not messed up or anything." Neal told Weaver that "medical [is] coming to check you out." Weaver said he wanted to leave, but Neal insisted that he stay, even when Weaver said he did not need medical attention.

Neal updated his dispatcher and then reiterated to Weaver that he was concerned because people had reported that Weaver was passed out. Weaver asserted that Neal could "tell [Weaver was] not messed up," but Neal replied that he did not know that for sure and that maybe Weaver's blood pressure had "dropped out." At that point, Weaver stated that he was also taking blood pressure medication. Neal and Weaver continued talking and, about four and a half minutes into the encounter, an ambulance arrived on scene, as did Deputy Sheriff Timothy Purdin.

Neal walked toward Purdin, who asked if it was a "46," which is the code for DUI. Neal replied, "I don't know if it's 46 or medical; I can't smell anything." Neal then went to talk to Trent while the medics assessed Weaver. Trent confirmed the information that he called 911 because he had such a difficult time getting Weaver to respond. During their conversation, Neal told Trent, "I can't tell if he's drunk, or it's a medical issue."

3

Meanwhile, Purdin talked with Weaver and noticed that his "eyes were bloodshot, watery, extremely droopy. It looked like he could barely keep his eyes open." Purdin "also noticed that [Weaver's] speech was thick and slightly slurred, and [Purdin] thought that was odd for three o'clock in the afternoon, or 3:30." When asked, Weaver told Purdin that he had been drinking the night before and that he had taken OxyContin and oxycodone that morning.

As Neal walked back toward Weaver's car after finishing his conversation with Trent, Purdin approached and said, "He's saying he took some medication. I might pull him out and test him if—if he's refusing to go. Uh, I saw some HGN in his eyes. I can't smell anything either, but we can pull him out and talk to him." Neal relayed Trent's statement to Purdin. Purdin said, "Ok, well I'll talk to [Weaver] and see if I can't get a good confession of driving and we'll pull him out and test him."

Purdin walked back to Weaver's vehicle, and asked, "Do you have your driver's license on you?" At that point, it appears from footage retrieved from Neal's body camera that Purdin obtained and retained Weaver's driver's license.

With medics still standing around Weaver's driver's-side window, Purdin asked Weaver if he had been driving and whether he had "pulled over to take a nap." Purdin continued talking to Weaver, asking him where he was headed. It appears that Purdin asked Weaver if he wanted medical attention "or are you going to be okay?" Purdin then turned back to the medics standing by the vehicle and said, "I'm going to go ahead and test him." Purdin later testified that he conducted the alphabet test and the counting test before medics left the scene.

After the medics left, Purdin told Weaver that he wanted "to make sure [Weaver was] a safe driver" and if he was, they would let him on his way. Over about the next eight minutes, Purdin administered or tried to administer several field sobriety tests,

4

throughout which Weaver maintained that his knees made it impossible for him to comply with some of the physical requirements of the tests. At about 23 minutes into the stop, Purdin asked Weaver to take a preliminary breath test (PBT) and, when Weaver refused, Purdin arrested him. The record does not reflect whether Weaver eventually submitted to blood-alcohol testing.

The State at first charged Weaver with one count of DUI and one count of refusing a PBT, but the State later dismissed the second count. Weaver filed a motion to suppress the evidence. He argued that Neal lacked reasonable suspicion to stop his vehicle, that the deputies unlawfully detained him after medical personnel cleared him, and that Purdin lacked probable cause to arrest him for DUI. The State responded and argued that Neal's initial encounter with Weaver was "a valid and legal public safety stop based on specific and articulable facts, which transitioned into an investigatory stop once Deputy Neal and Deputy Purdin had reasonable suspicion that a crime had occurred," and that Purdin had probable cause to arrest Weaver for DUI.

The district court held an evidentiary hearing on Weaver's motion to suppress on July 12, 2018, and Trent, Neal, and Purdin testified at the hearing. Footage from Neal's body camera was admitted into evidence and at least a portion of that footage was played for the district court. In addition to the facts set forth above, Purdin agreed that he used the in-car tests "solely for the purposes of testing for impairment" and "[a]t that point in time [he was] solely investigating a possible DUI." On cross-examination, Purdin conceded that before medics finished with Weaver, he told Neal that he was going to detain him even if the medics cleared him.

After hearing the evidence and the parties' arguments, the district court ruled from the bench. The district court summarized the facts leading up to Neal's arrival at the scene, as well as Weaver's initial statements to Neal, and the district court found that Neal made "a public safety stop for a medical condition." The district court continued:

5

"Deputy Neal told Mr. Weaver that he needed to be checked out medically.

"He had told him that he couldn't leave, took—had his license, questioning whether or not he is being on a public safety stop for his medical condition, or very clearly, Deputy Neal says he was investigating all possibilities, including that it could be that he was an impaired driver.

"Mr. Weaver indicated that when responding to Deputy Neal, that he just wanted to leave, he didn't need any further medication, in fact, [he] ultimately declines any treatment from the EMT's.

"Mr. Weaver denies that he was unconscious, that he was passed out, said he was tired, that's when Officer Purdin arrives. Officer Purdin is there when the EMTs are starting to work with Mr. Weaver.

"There is no smell of alcohol. There is at that point a denial of drinking, other than the night before.

"Deputy Neal is reporting to Deputy Purdin that he is not sure if this is a medical issue or a 46, an impaired driver.

"Clearly the deputies were responding as a medical emergency.

"It's natural for them to also consider that a person may be intoxicated or otherwise impaired from the report of Mr. Trent that at an intersection on a bright, sunny afternoon, that person in the car driving, turned out to be Mr. Weaver, is slumped over face first into the steering wheel, over the steering wheel, and not responsive to shouts, pounding on the door and window until being startled awake.

"Listening to Deputy Purdin's testimony kind of goes sequentially through, in that he was waiting for the medical unit to clear the scene, and he is doing these in-car tests, the alphabet and counting test.

. . . .

"And Deputy Purdin is pretty quickly moving to—as he stated, started to believe that the issue was impairment.

"He kind of goes from what Deputy Neal says is—not sure if this is medical or impairment.

. . . .

"Officer Purdin tells Officer Neal that even if medical lets him go, they're going to detain him for possible impairment, but it's his—his testimony was, medical was still finishing up with him and he already started the in-car testing, if you will, the alphabet test, the counting backwards test.

6

"And I think this is one of those situations—I'm not blaming the officers on what they were doing, but this was a conglomeration that it was clearly a public safety issue in trying to assure safety, both of Mr. Weaver and the public on the highway, but this was not a situation where the public safety issues were resolved and terminated, and then projecting on or moving forward to an investigatory portion for an impaired driver.

"The deputies were mixing this all together, and I think I agree with the defense argument from the [*Gonzalez*] case that that combination or that mixture, without objective and specific evidence that can be articulated in terminating the resolution of the medical issue and moving to investigatory, that that was a point in time in which the stop changed.

"And based upon that I'm going to sustain the defendant's motion to suppress for those reasons given, the medical issue, the peril, if you will, having been resolved, whether it's simply the fact that Mr. Weaver did not want to be treated or not want to be transported, the deputies had already initiated the investigatory phase of believing that this was an impaired driver, certainly from the testimony of Deputy Purdin.

"So the defendant's motion will be sustained."

On July 30, 2018, the State filed a motion for reconsideration. The State asked the district court to reconsider its ruling that the public safety stop exceeded its permissible scope when the deputies began investigating a potential DUI "prior to medical personnel leaving the scene of the stop." The district court held a hearing on the motion to reconsider on August 22, 2018. In denying the State's motion, the district court stated:

"[T]he essence of the finding here and the State argues again in the motion to reconsider is that clearly the officers were making this valid public safety stop. I did state that that— their initial reasoning, their contact was legitimate, was reasonable, but as [the defendant] noted, there was discussion about a medical emergency. But before the [medics] had cleared the scene, the officers quickly thought of whether this was an impaired driver issue. The quote that I had here [in the court's notes] which was from watching the video was [']Not sure if it is medical or a 46[,'] being a potential impaired or drunk driver.

"There was conflicting statements as far as what Mr. Weaver—how he responded . . . . Deputy Neal stated that Mr. Weaver said he had taken some meds and had drank alcohol earlier in the day. On cross-examination, he stated that [Weaver] had denied

7

drinking. His last drink was the prior evening. Did not enquire with Mr. Weaver in the course of the questioning as to any meds taken, how much, what the dosage was, when it was taken and [Neal said] that they deferred to the [medics] as to the further medical investigation.

"The fact that the officers stated bloodshot eyes, watery eyes, extremely droopy and thick slurred speech, the State argues as you did at the suppression motion [hearing] that this was the basis for reasonable suspicion. Public safety stop was over. Reasonable suspicion was already there. They had a reason to continue on and make it an investigatory stop. That was the essence of what I found from listening to the testimony, watching the video was that there wasn't—taking all of the facts together, all of the evidence that officers didn't have a reasonable articulation of that impairment.

"That is was where it was between a medical emergency, whether or not that was an emergency perhaps that Mr. Weaver was conscious, that he had not been that way [when] Mr. Trent first came on the scene. Still they were looking at the public safety issue of trying to determine if he needed medical assistance. [Medics] were working with him and the officers proceeded into in essence a DUI investigation. That is where the break did not occur.

"That was—is the basis for the ruling that I made. I still believe that is correct, and for that reason . . . the State's motion will be denied."

On August 29, 2018, the State filed its notice of interlocutory appeal. On September 11, 2018, the district court signed and filed a Journal Entry submitted by the State and reviewed by defense counsel that stated:

"This matter comes on before the Honorable Judge T. Kelly Ryan of the District Court of Johnson County, Kansas on the Defendant's Motion to Suppress. [Appearances by counsel and defendant noted.]

"This Court, on July 12, 2018, after briefing and argument, granted the defendant's Motion to Suppress, for the reasons stated on the record. On August 22, 2018, the State's motion for reconsideration was denied for the reasons stated on the record."

8

On appeal, the State claims the district court erred by granting Weaver's motion to suppress the evidence. Specifically, the State asserts that "[a]n officer responding to a public safety dispatch is not required to ignore obvious indications of criminal activity until the public safety investigation is concluded before he begins considering whether reasonable suspicion of criminal activity is present." Weaver responds by first asserting that this court lacks jurisdiction to hear this appeal because the notice of appeal was untimely under K.S.A. 2018 Supp. 22-3603. On the merits, Weaver argues that the district court committed no error by suppressing evidence of an illegal stop.

*Appellate jurisdiction*

As a threshold issue, Weaver argues that this court lacks jurisdiction over this appeal because the State did not timely file its notice of appeal.

> "'[T]he right to appeal is entirely statutory,' and 'the limits of appellate jurisdiction are imposed by the legislature.' As such, the determination of whether the Court of Appeals [has] jurisdiction over an appeal rests on the interpretation of statutes and involves a question of law 'over which we exercise unlimited review.' [Citations omitted.]" *State v. LaPointe*, 305 Kan. 938, 941-42, 390 P.3d 7 (2017).

The State brings this interlocutory appeal under K.S.A. 2018 Supp. 22-3603, which states:

> "When a judge of the district court, prior to the commencement of trial of a criminal action, makes an order quashing a warrant or a search warrant, suppressing evidence or suppressing a confession or admission an appeal may be taken by the prosecution from such order if notice of appeal is filed within 14 days after entry of the order. Further proceedings in the trial court shall be stayed pending determination of the appeal."

Weaver argues that this court lacks jurisdiction over this appeal because the State did not take the appeal within 14 days of the July 12, 2018 order granting suppression. The State filed no reply brief to respond to Weaver's jurisdictional claim. But the State's original brief asserted that this court has jurisdiction under K.S.A. 2018 Supp. 22-3603 and that a notice of appeal was filed within 14 days of the entry of the order suppressing the evidence. Thus, we do not find that the State has waived or abandoned the jurisdictional issue.

On whether the State filed a timely notice of appeal, the record reflects the following timeline of significant events:

- 7-12-18 district court's ruling from the bench granting motion to suppress;
- 7-30-18 State files a motion to reconsider;
- 8-22-18 district court's ruling from the bench denying motion to reconsider;
- 8-29-18 State files notice of appeal from order granting motion to suppress;
- 9-11-18 parties file written journal entry granting motion to suppress; and denying motion for reconsideration.

The district court ruled from the bench at the hearing on July 12, 2018, and granted Weaver's motion to suppress. The district court's ruling from the bench did not state whether the announcement of the ruling was intended to constitute entry of the order or whether the district court expected the parties to file a journal entry. But at the end of the hearing, the State notified the district court that it possibly intended to file a motion to reconsider, so the court set a date at which it would consider such a motion if it were filed. The State later filed a motion to reconsider, which the district court heard on August 22, 2018. The district court denied the motion from the bench. The State filed a notice of appeal seven days after that ruling.

The State argues that its notice of appeal is timely because it was filed within 14 days after the ruling from the bench denying the motion to reconsider on August 22, 2018. We disagree that we have appellate jurisdiction for that reason. Under K.S.A. 2018 Supp. 22-3603, the State must file its notice of appeal within 14 days after "entry of the order" granting the motion to suppress. The question we must decide is when was the date of the "entry of the order" granting Weaver's motion to suppress.

"'Oral orders which are appealable must, when entered, be on the record, and should expressly state whether the announcement alone is intended to constitute entry of the order or whether the trial court expects the order to be journalized.'" *State v. Michel*, 17 Kan. App. 2d 265, 267, 834 P.2d 1374 (1992). Here, if the district court's ruling from the bench granting the motion to suppress on July 12, 2018, constituted the entry of the order, then the State's notice of appeal was untimely because it was not filed within 14 days after that date. The fact that the State's notice of appeal was filed within 14 days of the district court's ruling denying the motion to reconsider is immaterial.

But the district court did not expressly state that its ruling from the bench on July 12, 2018, was intended to constitute the entry of the order granting the motion to suppress. When that fact is considered along with the fact that a written journal entry approved by both the State and defense counsel was signed by the district court and filed on September 11, 2018, we must presume that the district court intended the written journal entry to constitute the entry of the order granting the motion to suppress.

Here, the State filed its notice of appeal from the district court's order granting the motion to suppress on August 29, 2018. But the order granting the motion to suppress was not entered of record until the journal entry was filed on September 11, 2018. So what we have here is a premature notice of appeal filed between the time the judge ruled from the bench on July 12, 2018, and the time the journal entry was filed on September

11

11, 2018. But in this instance, we have jurisdiction over a premature notice of appeal under Kansas Supreme Court Rule 2.03 (2019 Kan. S. Ct. R. 14).

*State v. Bohannon*, 3 Kan. App. 2d 448, 450-51, 596 P.2d 190 (1979), is a case with similar facts. In that case, the district court announced its decision granting a motion to suppress in a one-page letter to counsel dated August 29, 1978. The district court did not state whether it intended the letter to be the entry of the order. At that time, K.S.A. 22-3603 required the State to file a notice of appeal within 10 days. The State filed its notice of appeal on September 11, 1978, more than 10 days after the letter announced the district court's decision. But a journal entry was later filed on September 27, 1978, granting the motion to suppress. Under these facts, this court held that the premature notice of appeal was effective under Rule 2.03. *Bohannon*, 3 Kan. App. 2d at 450-51; see *Michel*, 17 Kan. App. 2d at 266-68 (finding jurisdiction under Rule 2.03 under similar facts). Based on Rule 2.03 and this court's prior decisions interpreting that rule, we find that this court has jurisdiction over the State's appeal.

*Merits of the appeal*

Turning to the merits of the appeal, the State argues that the district court erred by granting Weaver's motion to suppress the evidence. The thrust of the State's argument is that the encounter between the deputies and Weaver began as a valid public safety stop but then evolved into an investigatory detention based on reasonable suspicion that Weaver was DUI. Weaver argues that the district court committed no error by suppressing the evidence based on an illegal stop.

On a motion to suppress evidence, the burden is on the prosecution to prove the lawfulness of any search and seizure. K.S.A. 22-3216(2); *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016). The standard of review for a district court's decision on a motion to suppress has two parts. The appellate court reviews the district court's factual

findings to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion, however, is reviewed using a de novo standard. In reviewing the factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

Combining the district court's findings at the suppression hearing with its findings at the hearing on the motion to reconsider, the district court suppressed the evidence because it found:  (1) the safety stop was not sufficiently divorced from the DUI investigation and (2) when the safety stop concluded, the deputies did not have articulable reasonable suspicion to support extending the stop as a DUI investigation. We will first address whether the district court erred by finding that the stop became unlawful when the officers began the DUI investigation before the public safety stop had ended.

The parties seem to agree, and the district court found, that the encounter between Weaver and the officers began as a valid public safety stop. A public safety stop "does not require the police to have reasonable suspicion of a civil or criminal infraction. However, a safety stop must be '"divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."'[Citations omitted.]" *State v. Messner*, 55 Kan. App. 2d 630, 631, 419 P.3d 642 (2018). "[A]s with any other police encounter, the scope of the detention during a public safety stop cannot exceed the justifications for the stop." *State v. Gonzales*, 36 Kan. App. 2d 446, 455, 141 P.3d 501 (2006). In applying the public safety rationale to justify a police-citizen encounter, courts employ careful scrutiny "so the protections of the Fourth Amendment are not emasculated." 36 Kan. App. 2d at 455.

The *Gonzales* court determined that the legality of a public safety stop can be evaluated in three steps. First, as long as there are objective, specific, and articulable facts from which a law enforcement officer would suspect that a citizen needs help or is in peril, the officer has the right to stop and investigate. Second, if the citizen needs aid,

the officer may take appropriate action to render assistance. Third, once the officer is assured that the citizen is not in peril or is no longer in need of assistance, any actions beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment to the United States Constitution. 36 Kan. App. 2d at 456.

The State argues that the district court erred in finding that the officers impermissibly commingled the safety stop with the DUI investigation, asserting instead that Purdin and Neal "were justified in shifting gears toward a possible DUI investigation as the public safety stop progressed." Citing *State v. Jimenez*, 308 Kan. 315, 324, 420 P.3d 464 (2018), the State contends that the officers need not "turn a blind eye to evidence of criminal activity that presents itself to them when they [are] otherwise properly conducting a stop."

*Jimenez* does not apply here because it involved a traffic stop, which is "analogous to an investigative detention" and does not implicate the same jurisprudence as public safety stops. See 308 Kan. at 323. Similarly, the State's reliance on *State v. Schooler*, 308 Kan. 333, 346, 419 P.3d 1164 (2018), for the proposition that police need not "perform their duties with a blind eye," is unpersuasive because *Schooler*, which quoted *Jimenez*, also involved a traffic stop, not a public safety stop. See 308 Kan. at 346.

In granting Weaver's motion to suppress, the district court found that "medical was still finishing up with [Weaver] and [Purdin] already started the in-car testing, if you will, the alphabet test, the counting backwards test." Stated more succinctly, the district court found that Purdin started the in-car field sobriety testing before the medical unit was finished with Weaver. This factual finding is based on Purdin's testimony and the State does not challenge this factual finding on appeal. When an appellant does not challenge the underlying factual findings the district court made, this court will not review them to determine whether they are supported by substantial competent evidence. See *State v. Murphy*, 296 Kan. 490, 492, 293 P.3d 703 (2013).

14

At the suppression hearing, Purdin agreed that the alphabet test and the counting test were "two tests that [he] utilize[d] when testing for driving impairment," and he also agreed that when he asked Weaver to complete the alphabet and the counting test that he was "utilizing [them] solely for the purposes of testing for impairment." He stated that when he administered the tests, "I'm solely investigating a possible DUI." This investigation into possible DUI runs contrary to the purpose of a safety stop, which is for an officer to take appropriate action to render assistance if the citizen is in need of aid. See *Gonzales*, 36 Kan. App. 2d at 456. Thus the district court did not err in finding that Purdin strayed outside the permissible scope of a safety stop by administering sobriety tests before medics completed interacting with Weaver.

The body camera footage also shows that Purdin obtained and retained Weaver's driver's license and asked about ownership of the car Weaver was driving before Weaver refused medical treatment and the medics left the scene. Our Supreme Court has held that an officer's mere request for identification usually will not constitute a seizure. See *State v. Pollman*, 286 Kan. 881, 888, 190 P.3d 234 (2008). But in *Pollman*, the court held that an officer's *retention* of an identification card is one factor to be considered in applying the totality of the circumstances test, and that factor may, absent offsetting circumstances, mean a reasonable person would not feel free to leave or otherwise terminate an encounter with the officer. 286 Kan. at 889. Similarly, this court has repeatedly held that although an officer may request identification during a public safety stop, *retaining* an identification card or driver's license exceeds the scope of a public safety stop. See, e.g., *State v. Manwarren*, No. 119,520, 2019 WL 1575375, at *6-7 (Kan. App. 2019); *Messner*, 55 Kan. App. 2d at 637.

Purdin requested and retained Weaver's driver's license before Weaver refused medical treatment and the medics left the scene. Contrary to the State's assertion, Purdin's action was not "directly tethered to the public safety concern that instigated the stop." By

requesting and retaining Weaver's driver's license before he refused medical treatment, Purdin impermissibly engaged in investigative acts during the safety stop.

The State's brief argues that "[a]n officer responding to a public safety dispatch is not required to ignore obvious indications of criminal activity until the public safety investigation is concluded before he begins considering whether reasonable suspicion of criminal activity is present." We take no issue with the State's assertion. But the district court did not grant Weaver's motion to suppress simply because the deputies began "considering" whether there was reasonable suspicion of criminal activity before the public safety stop had ended. Instead, the district court found that Purdin started the in-car field sobriety testing before the medics had cleared Weaver and left the scene. Moreover, the evidence shows that Purdin requested and obtained Weaver's driver's license before Weaver refused medical treatment and the medics left the scene.

These findings support the district court's ultimate conclusion that the deputies began conducting a DUI investigation before the public safety stop had ended, contrary to well-settled Kansas law that a safety stop must be divorced from a criminal investigation. See, e.g., *Messner*, 55 Kan. App. 2d at 631. As a result, we conclude the district court did not err in granting Weaver's motion to suppress based on what became an unlawful safety stop not sufficiently divorced from the DUI investigation. Because this conclusion resolves the State's appeal, we need not address the district court's alternative finding that the deputies did not have articulable reasonable suspicion to support a DUI investigation.

Affirmed.

16