No. 113,730

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

CARLOS EDUARDO MARTINEZ MORALES,
*Appellee*.

SYLLABUS BY THE COURT

1.

In considering a trial court's decision on a motion to suppress, an appellate court applies a bifurcated standard when reviewing a trial court's decision involving a motion to suppress. The appellate court reviews the trial court's factual findings to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion is reviewed using a de novo standard. In reviewing the factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses.

2.

The State bears the burden of proof for a suppression motion. It must prove to the trial court the lawfulness of the search and seizure.

3.

To establish reasonableness in asserting a public safety stop exception to the warrant requirement of the Fourth Amendment to the United States Constitution, the State has the burden to show that the officer has objective, specific, and articulable facts to suspect a citizen is in need of help or is in peril.

1

4.

A public safety stop is to be totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

Appeal from Reno District Court; RANDALL H. MCEWEN, judge. Opinion filed December 11, 2015. Affirmed.

*Andrew R. Davidson*, assistant district attorney, *Keith Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Andrew L. Oswald*, of Hutchinson, for appellee.

Before MALONE, C.J., GREEN and POWELL, JJ.

GREEN, J.:  This case presents the question of whether, under the "community caretaking function" exception to the warrant requirement of the Fourth Amendment to the United States Constitution, an officer was justified in activating his emergency lights and stopping a driver as he was attempting to drive away. The State charged Carlos Eduardo Martinez Morales with driving under the influence of alcohol (DUI). Morales moved to suppress all evidence based on the stop, asserting that the stop of his vehicle had been unlawful. The State resisted the motion to suppress, maintaining that the stop of Morales' vehicle was justified under the community caretaking exception to the warrant requirement of the Fourth Amendment. The trial court rejected the State's position, ruling that the arresting officer did not have any specific and articulable facts that would justify a bona fide community caretaking stop.

We conclude that under the circumstances later discussed, the community caretaking exception is inapplicable and the seizure of Morales' vehicle was impermissible. Accordingly, we affirm the judgment of the trial court.

FACTUAL AND PROCEDURAL BACKGROUND

On November 22, 2014, Officer Travis Vogt of the Reno County Sheriff's Office was patrolling K-96 highway in Reno County. At approximately 2:34 a.m., he was at the intersection of K-96 and Victory Road, a rural area. Officer Vogt spotted a vehicle stopped on the north side of K-96 with its lights on. He later testified that because the vehicle was off the highway in the early morning hour, in a remote rural area, he was concerned that the vehicle may have broken down.

It is disputed whether the occupants of the vehicle were in or out of the vehicle when Vogt spotted it. Officer Vogt testified that as he approached the vehicle he saw two individuals outside of the vehicle; as he came closer, they got into the vehicle. Morales testified that he and his passenger never got out of the vehicle. As Officer Vogt drove closer, he saw the vehicle's brake lights activate; he then activated his emergency lights to make contact with the driver. Officer Vogt did not witness any traffic violations or any other infractions. He testified that he was suspicious because of the vehicle's location.

Officer Vogt testified that as he pulled in behind the vehicle, he had the dispatcher run a check of the license tag. He wanted to determine if he would get any "hits" or "alerts" concerning the vehicle. Officer Vogt further testified that the dispatcher would notify him immediately if there were any hits or alerts concerning the vehicle.

Officer Vogt testified that he got out of his vehicle, approached Morales' vehicle, and asked the driver if "everything was okay." Officer Vogt testified that he immediately smelled the odor of alcohol coming from the interior of the vehicle. Vogt also testified that when he was next to Morales' vehicle, he noticed that the vehicle's engine was running and the vehicle's engine was in the neutral position. Officer Vogt further noticed that the driver, Morales, who speaks Spanish, had bloodshot and watery eyes. Morales

3

failed one field sobriety test but passed a second test. Morales then took and failed a preliminary blood test at the scene.

The State charged Morales with DUI. Morales moved to suppress all evidence obtained as a result of the stop, maintaining that the stop of his vehicle had been improper. The State responded that the stop of Morales' vehicle was justified under the community caretaking exception to the warrant requirement of the Fourth Amendment.

The trial judge heard evidence and arguments on the matter and asked for supplemental briefing before he decided the case. The trial judge later issued an order granting Morales' motion to suppress evidence, declaring: "We do not have any concise, specific and articulable [facts] as to why a stop needed to be made in this instance."

*Standard of Review*

Our Supreme Court has adopted a framework of reviewing a trial court's decision on a motion to suppress. In *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014), the court set forth the following standard of review: An appellate court applies a bifurcated standard when reviewing a trial court's decision involving a motion to suppress. The appellate court reviews the trial court's factual findings to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion is reviewed using a de novo standard. In reviewing the factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses. The State bears the burden of proof for a suppression motion. It must prove to the trial court the lawfulness of the search and seizure.

"There are four types of police-citizen encounters: investigatory stops, voluntary encounters, public safety stops, and arrests." *Nickelson v. Kansas Dept. of Revenue*, 33

Kan. App. 2d 359, 362, 102 P.3d 490 (2004). In the case at hand, the State argues solely that Officer Vogt's stop of Morales was a valid public safety stop.

On the other hand, Morales argues that this stop was an investigatory stop cloaked as a public safety stop. Morales maintains that allowing investigatory stops to be cloaked in the guise of public safety stops will emasculate the constitutional protection provided to motorists.

*Public Safety Stop*

Public safety stops were first recognized by the Kansas Supreme Court in *State v. Vistuba*, 251 Kan. 821, 840 P.2d 511 (1992), *disapproved in part on other grounds by State v. Field*, 252 Kan. 657, 847 P.2d 1280 (1993). The *Vistuba* court held: "A civil or criminal infraction is not always essential to justify a vehicle stop. Safety reasons alone may justify the stop if the safety reasons are based upon specific and articulable facts." 251 Kan. 821, Syl. ¶ 1.

The legality of a public safety stop can be evaluated in three steps. First, the officer has a right to stop and investigate as long as there are objective, specific, and articulable facts from which a law enforcement officer would suspect that a citizen is in need of help or is in peril. *State v. Gonzales*, 36 Kan. App. 2d 446, Syl. ¶ 3, 141 P.3d 501 (2006). Second, the officer may take appropriate action to render assistance if the citizen is in need of aid. 36 Kan. App. 2d 446, Syl. ¶ 3. In order to render this assistance, appropriate action has been held to include an officer blocking a vehicle's entrance back onto the road and an officer activating his emergency lights to make initial contact with the vehicle. *Nickelson*, 33 Kan. App. 2d at 361 (entrance to road blocked by officer); *State v. Schuff*, 41 Kan. App. 2d 469, 471, 202 P.3d 743 (2009), *rev. denied* 289 Kan. 1284 (2010) (emergency lights activated to make initial contact with the vehicle). Third, once the officer is assured that the citizen is not in need of help or is not in peril, any

actions beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment to the United States Constitution. *Gonzales*, 36 Kan. App. 2d 446, Syl. ¶ 3.

To justify a public safety stop, the State has the burden to show that the officer has "objective, specific, and articulable facts to suspect that a citizen is in need of help or is in peril." *State v. Marx*, 289 Kan. 657, 662, 215 P.3d 601 (2009). Moreover, public safety stops are to be "'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *City of Topeka v. Grabauskas*, 33 Kan. App. 2d 210, 214-15, 99 P.3d 1125 (2004) (quoting *Cady v. Dombroski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 [1973]). In stating that there are limits to an officer's authority under the community caretaking function, this court declared: "Unless a public safety stop is based upon specific and articulable facts, the concept could 'emasculate the constitutional protection afforded a motorist's privacy under *Terry* [*v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)].'" *Nickelson*, 33 Kan. App. 2d at 364 (quoting *State v. Ludes*, 27 Kan. App. 2d 1030, 1035, 11 P.3d 72, *rev. denied* 270 Kan. 902 [2000]).

Furthermore, the *Gonzales* court held that public safety stops are not to be used for investigative purposes. 36 Kan. App. 2d at 457. Finally, our Supreme Court declared that "permitting the public safety rationale to serve as a pretext for an investigative detention runs the risk of emasculating our Fourth Amendment protection." *Marx*, 289 Kan. at 663.

*Bona Fide Community Caretaking Activity*

Next, we turn to the question whether Officer Vogt's conduct constituted a bona fide community caretaking activity.

6

The community caretaking exception has its roots in the United States Supreme Court's decision in *Cady v. Dombrowski*, 413 U.S. at 441. This case involved a warrantless search of the trunk of a damaged car that had been towed from the scene of an accident. The intoxicated driver, a Chicago police officer, was required to carry his service revolver at all times, but no revolver was found on the officer. Because local law enforcement believed the revolver might be in the trunk of the towed car, they searched the trunk to protect the public from the possibility of the handgun falling into someone else's hands. Although the local police did not find the handgun during the search of the trunk, they retrieved other evidence that was later used to convict the driver of first-degree murder.

The Supreme Court held that the warrantless search in *Cady* was lawful as a community "caretaking" function based on "concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." 413 U.S. at 447.

Returning to the facts of this case, we note that Officer Vogt testified that when he saw the headlights on Morales' vehicle, he was concerned that the vehicle may have broken down. Officer Vogt also testified that when he pulled in behind Morales' vehicle, he noticed that the driver had activated the brake lights of the vehicle. Officer Vogt further testified that because he believed the driver was attempting to drive away, Vogt activated his emergency lights.

Officer Vogt acknowledged that Morales' vehicle was appropriately parked on the county road, with the headlights on, as he drove up behind Morales' vehicle. Moreover, Officer Vogt testified that he never observed Morales commit any traffic violations before making the stop. Thus, it seems Officer Vogt did not see anything to indicate that the driver of the vehicle was acting in such a manner as to pose a danger to the public.

7

During the suppression hearing, Officer Vogt was asked, under direct examination, about the Reno County Sheriff Department's formal community caretaking policy concerning vehicles observed in rural areas late at night:

"[Prosecutor]: What is the Reno County Sheriff Department policy on vehicles you find basically in the middle of a rural area with no one around that you see stopped at 2:30 in the morning?

"[Vogt]: It's, it's our, it's our department's job to check on any vehicles that are either parked along side of the roadway, abandoned, basically to check to make sure if they are occupied everything is okay, they're not having mechanical problems. If a vehicle is out in this area, you know, out in, in a rural area like that, to make sure they're not stolen or, or a part of some other crime that we would get a hit off of by running the tag, something like that."

Still under direct examination, Officer Vogt was asked what his actions were when he pulled in behind Morales' vehicle:

"[Prosecutor]: When you ran up on the vehicle or pulled up on it, did you run its tag at that point in time before you got out of your car?

"[Vogt]: I advised dispatch of the tag but then I didn't run it myself. I advised dispatch of my location and the tag number and at that point if there would have been any, any, what I'm going to say hits or, or alerts on it our dispatch would have notified me right away."

Based on Officer Vogt's testimony concerning the sheriff department's formal policy on community caretaking function involving vehicles, it is readily apparent that it is composed of two prongs. The first prong deals with vehicles parked along the side of the road or abandoned. The second prong is concerned with vehicles located in rural areas either parked or abandoned.

In addition, Officer Vogt testified that he was suspicious of Morales' vehicle because it was parked in a rural area at 2:30 in the morning. When asked on cross-examination about what suspicions he had, he stated, "[W]ho knows what could be going on. If there was irrigation—we have a lot of irrigation thefts out in the rural county. If, they could have been out committing a theft, irrigation equipment."

The State relies heavily on our *Nickelson* holding. The State maintains that the facts in this case are similar to those in *Nickelson*. We disagree. The facts in this case are far different from those in *Nickelson*. Unlike the officer in *Nickelson*, Officer Vogt articulated only three reasons to support his belief that Morales may have needed assistance: (1) Morales' vehicle was parked on the side of the road, although it was properly parked; (2) it was very early in the morning; and (3) Morales' vehicle was located in a rural area.

Yet, the officer in *Nickelson* articulated a number of objective and specific reasons to support his belief that the driver in the car may have been in need of help: (1) the driver had turned into the "middle of nowhere" and turned off his vehicle's lights; (2) there were no farm buildings, outbuildings, businesses, or residences in the area; (3) it was 1 a.m.; (4) it was the Kansas Highway Patrol policy to check on the welfare of stranded motorists; and (5) the officer's supervisors had given him instructions to stop and assist people on the highways. 33 Kan. App. 2d at 360-61. In this case, Morales' lights were on when Officer Vogt pulled in behind Morales' vehicle. Moreover, any concern that Officer Vogt may have had initially about Morales' vehicle breaking down would have evaporated when Morales attempted to drive his vehicle away.

Most important, the Kansas Highway Patrol's community caretaking policy under *Nickelson* was limited to checking on the welfare of any stranded motorist. Moreover, the officer in *Nickelson* had been instructed to stop and assist people on the highways. Unlike in *Nickelson*, the sheriff department's community caretaking policy in this case contained

9

an expressed investigatory component. Based on Officer Vogt's testimony, the sheriff department's community caretaking policy requires its officers to check on any vehicle that is either parked along the side of the road or abandoned for public safety. Moreover, if a vehicle is located in a rural area, as Morales' vehicle was, officers are to make sure that the vehicle is not stolen or a part of some other crime that the officers might uncover by running the vehicle's license tag.

Because Morales' vehicle was located in a rural area at 2:30 in the morning, it was readily apparent that Officer Vogt was operating under the second prong of the sheriff department's formal community caretaking policy: to make sure that Morales' vehicle was not stolen or was not a part of some other criminal activity. This position is supported by the fact that Officer Vogt had the dispatcher run Morales' license plate tag immediately upon pulling in behind Morales' vehicle. Officer Vogt asking the dispatcher to run a check on Morales' license tag is inconsistent with a safety stop. In fact, the Iowa Supreme Court in *State v. Kurth*, 813 N.W.2d 270, 279 (2012), stated that an officer running a license plate before making a public safety stop is "inconsistent with a public safety purpose but is certainly consistent with an investigative purpose."

As a result, the sheriff department's community caretaking policy is not "'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *Grabauskas*, 33 Kan. App. 2d at 214-15 (quoting *Cady*, 413 U.S. at 441). In fact, Officer Vogt testified that the detection of crime was the principle reason for running a license plate tag in a rural area. Obviously, this policy violates the legal principles of *Grabauskas*, *Gonzales*, and *Marx*.

The fallacy of letting officers masquerade an investigatory stop as a public safety stop is perhaps better answered by logic than by legal precedent. An example of this is a story told of President Abraham Lincoln during his days as a trial lawyer. Lincoln is credited with cross-examining a witness in the following way:

10

"'How many legs does a horse have?'

"'Four,' said the witness.

"'Right', said Abe.

"'Now, if you call the tail a leg, how many legs does a horse have?'

"'Five,' answered the witness.

"'Nope,' said Abe, 'callin' a tail a leg don't make it a leg.'" *Lamon v. McDonnell Douglas Corp.*, 19 Wash. App. 515, 534-35, 576 P.2d 426 (1978) (Andersen, J., dissenting).

Thus, officers calling a stop a public safety stop does not make it so, especially when there is an expressed investigatory component to their stated community caretaking policy. The trial court determined as much when it declared the following: "We do not have any concise, specific and articulable [facts] as to why a stop needed to be made in this instance."

Indeed, *Nickelson,* the case which the State relies on so heavily, did not have an expressed investigatory component to its community caretaking policy, nor did the *Nickelson*'s community caretaking policy require its officers to run a check of the license tag number of the vehicle involved in the public safety stop. By contrast in this case, the State totally ignores that the sheriff department's community caretaking policy had an expressed investigatory component which was used as a basis to stop Morales' vehicle. As a result, *Nickelson* is simply not analogous to the present case.

Thus, the *Nickelson* holding will not bear nearly the weight of reliance which the State placed upon it. Even based upon a solely objective evaluation of the evidence, we cannot sustain Officer Vogt's seizure of Morales after Morales prepared to drive his vehicle away as a bona fide community caretaking function within the meaning of our legal precedents. Thus, we affirm the trial court's decision.

Affirmed.

11