NOT DESIGNATED FOR PUBLICATION

No. 116,401

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

AMANDA BLUTHARDT,
*Appellee*.

MEMORANDUM OPINION

Appeal from Geary District Court; RYAN W. ROSAUER. Opinion filed March 10, 2017. Affirmed.

*Tony Cruz*, assistant county attorney, and *Derek L. Schmidt*, attorney general, for appellant.

*Amber Cabrera*, assistant public defender, of Junction City, for appellee.

Before MCANANY, P.J., MALONE, J., and STUTZMAN, S.J.

*Per Curiam*:  The State appeals the district court's order granting a motion to suppress evidence that was obtained during a police search of a car in which Amanda Bluthardt was seated. The search led to Bluthardt being charged with possession of methamphetamine and drug paraphernalia and criminal possession of a firearm.

The search followed a call to the police in April 2014 asking them to check on two people who appeared to be passed out in a car in a Junction City motel parking lot. Detective Christopher Breidenstein and Officers Tatum and Keys responded. The engine of the car being investigated was running, but Breidenstein had not observed it being driven. The two police patrol cars stopped in the exits from the motel's parking lot.

Breidenstein and another officer stood on either side of the two front doors of the car in which the occupants were seated.

Breidenstein slowly walked around the car, looked inside, and saw two occupants passed out in the front seats—Bluthardt in the driver's seat and a man in the passenger seat. In examining the car Breidenstein noticed a syringe cap by the driver's side rear tire, but the State stated in oral argument before us that it does not rely on the presence of this cap to support the officers' subsequent search.

Keys told Tatum, who at some point told Breidenstein, that he saw "a firearm in plain view just behind the front passenger seat." (It is unclear whether Breidenstein was told about the gun before or after he asked for identification from the two occupants. In any event, the district court considered the timing irrelevant because carrying a gun in the car was not illegal and could not provide reasonable suspicion on its own to justify a search.)

Breidenstein knocked on the partially open driver's window and said he was with the police department and was checking on their well-being. He asked if Bluthardt and the other occupant were okay. Bluthardt said, "Yeah." Breidenstein asked what they were doing there. Bluthardt said they were waiting for a friend and had fallen asleep.

At that point, Breidenstein asked both occupants for their driver's licenses. Bluthardt stated she did not have a driver's license but had another form of identification. The other occupant said his identification was in a bag somewhere in the car.

As Bluthardt turned and reached for her wallet with her identification, Breidenstein asked Bluthardt why her pants were unbuttoned. She responded, "for comfort." According to Breidenstein, this made him suspect that "some lewd or lascivious behavior may have occurred."

2

Bluthardt buttoned her pants and gave Breidenstein her identification, which was a Kansas Department of Corrections inmate ID. Breidenstein told Tatum to run a "29 check" on Bluthardt's identification card, apparently to determine if there were any outstanding warrants against her.

After questioning Bluthardt about the circumstances of her visit to Junction City, where she was staying, the address where she lived, her Social Security number, and her telephone number, Breidenstein asked how long Bluthardt had been out of prison. She responded, "since July." Breidenstein then asked Bluthardt why she had been in prison. She said it was because of "a drug possession charge." Breidenstein asked when this occurred, and Bluthardt said it was in 2012.

According to Breidenstein, the information from Bluthardt and the earlier observation of a firearm in the car caused him to believe he had probable cause to search the car because Bluthardt was a felon in possession of a firearm. So he told Bluthardt and the passenger to get out of the car. When Bluthardt's passenger hesitated while looking for his jacket because he said he was cold, he was told it was 50 degrees outside and ordered to get out of the car without his jacket.

In the search that followed the police found the firearm they had already seen, along with drugs and paraphernalia which were the subject of the charges against Bluthardt.

In Bluthardt's suppression motion that followed, she alleged that the police exceeded the scope of a public safety encounter, detained and interrogated her, and conducted an illegal search of the car. The State maintained that the initial public safety encounter between Bluthardt and law enforcement turned into a consensual encounter and that Bluthardt was only detained after law enforcement had reasonable suspicion of

3

her driving without a license, engaging in lewd and lascivious conduct, and having unlawful possession of a firearm.

After hearing the testimony, the district court suppressed the evidence from the search. The district court found that there initially was a public safety encounter, which ended when Bluthardt and the other occupant confirmed that they were not in danger and everything was fine. At that point there was no reasonable suspicion for prolonging the encounter, but Breidenstein extended it when he demanded identification from them. At that point Bluthardt and her passenger were detained because of the presence of officers on either side of the car and the patrol cars being parked in a fashion that would cause reasonable persons to believe that they were not free to decline the request for a driver's license and simply drive away.

The State's interlocutory appeal brings the matter to us. In considering the district court's ruling, we normally apply a bifurcated standard. First, we review the trial court's finding to determine if they are supported by substantial competent evidence. In doing so, we do not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. Then we review de novo the district court's ultimate legal conclusion regarding the suppression of evidence. But if the material facts are not in dispute, we have de novo review over the suppression motion. See *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016). Here, there does not appear to be any factual dispute between the parties. They differ on how the court should characterize the nature of the encounter as it developed there in the parking lot, but this is an issue of law rather than of fact.

Both the Fourth Amendment to the United States Constitution and Section 15 of the Kansas Constitution Bill of Rights guarantee every individual the liberty to be free from unreasonable seizures. We recognize four types of encounters: consensual encounters, which are not seizures; investigative detentions, commonly known as *Terry*

4

stops; public safety stops; and arrests. *State v. Reiss*, 299 Kan. 291, 296-97, 326 P.3d 367 (2014).

When analyzing public safety encounters, we consider the factors set forth in *State v. Morales*, 52 Kan. App. 2d 179, 182, 363 P.3d 1133 (2015), *rev. denied* 304 Kan. 1020 (2016). First, an officer must have objective, specific, and articulable facts that an individual is in need of help or is in peril. Second, an officer is allowed to take appropriate action to render assistance if aid is needed. Third, once an officer is aware that no help is needed, any further action constitutes a seizure under the Fourth Amendment. Finally, a public safety encounter must be ""totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."' [Citations omitted.]" *Morales*, 52 Kan. App. 2d at 182-83.

Thus, as stated in *State v. Gonzales*, 36 Kan. App. 2d 446, 458, 141 P.3d 501 (2006), requesting and retaining a driver's license to check for warrants turns both voluntary encounters and public safety encounters into investigatory detentions. In order for an officer to go beyond a voluntary encounter or a public safety check and detain a person for further investigation, the officer must have "'reasonable suspicion the seized individual is committing, has committed, or is about to commit a crime or traffic infraction. [Citations omitted.]'" *State v. Chapman*, 305 Kan. 365, 370, 381 P.3d 458 (2016).

Here, Breidenstein had objective, specific, and articulable facts that Bluthardt might be in need of help when he learned from dispatch that two persons appeared to be passed out in a car with the engine running. But upon inquiring of Bluthardt, Breidenstein quickly learned that there was no emergency, that the car's occupants were not in need of assistance, and that they had simply fallen asleep in the car while waiting for a friend. At that point, the public safety encounter ended.

5

In *Gonzales*, the defendant was stopped on the turnpike by a trooper who observed a tire on the defendant's truck that he thought might be defective and a safety risk. The court stated:

> "A public safety stop is *not* for investigative purposes. Asking for information about the ownership of the truck and demanding and retaining the occupants' driver's licenses exceeded the justification for the stop. That justification was limited to an examination of the tire to determine if it was safe to continue driving and to alert the driver about the condition of the tire. Obtaining and retaining the occupants' driver's licenses, under the circumstances of this case, exceeded the legitimate bounds for a safety stop. [Citations omitted.]" 36 Kan. App. 2d at 457.

The State contends that upon the public safety encounter ending, Breidenstein's asking for driver's licenses turned the encounter into a voluntary one. But, as the district court found, it does not appear that Bluthardt and her passenger were free to simply ignore the officers standing on either side of the two front doors of the car, refuse to produce any identification, and leave the parking lot by somehow maneuvering the car around the police cars at the exits. Under these circumstances, when Breidenstein asked Bluthardt and her companion for their driver's licenses, neither they—nor any reasonable person—would consider the request to be one they could ignore. From this point on, the encounter was not voluntary or consensual, but an investigatory detention which had to be based on reasonable suspicion of some criminal misconduct.

On this point, the State maintains that Breidenstein had a reasonable suspicion of criminal conduct founded on three separate bases: (1) Bluthardt "was attempting to operate a motor vehicle" because she "was in the driver's seat of a parked car, with the engine running"; (2) Bluthardt had been engaged in "lewd and lascivious" conduct because Breidenstein saw that her pants were unbuttoned after he asked her for her identification; and (3) criminal possession of a firearm based on Bluthardt's Department

6

of Corrections ID, the firearm observed in the car, and Bluthardt's admission that she had been convicted of a felony.

With regard to Bluthardt attempting to operate a motor vehicle, the State argues that it is illegal to operate a motor vehicle without a driver's license and that Breidenstein had reasonable suspicion that Bluthardt "was attempting to operate a motor vehicle, thus justifying the request for a driver's license." The only available evidence to support this is that Bluthardt was found asleep in the driver's seat of a car with the engine running in a parking lot. Breidenstein had not seen Bluthardt operate or attempt to operate the vehicle, nor had anyone else to Breidenstein's knowledge.

*State v. Darrow*, 304 Kan. 710, 714, 374 P.3d 673 (2016), involved a charge of operating or attempting to operate a vehicle while intoxicated. Darrow was found asleep behind the wheel of an automobile on a dead-end street with its engine running and the front of the car against a chain-link fence. Darrow had been left in the car by friends who attempted to drive her home after a night of drinking, but left her in the car after she became belligerent. Darrow climbed into the driver's seat and fell asleep. When the officer aroused Darrow, she fumbled with the gear-shift but was unsuccessful in getting the transmission out of park. The *Darrow* court cited *State v. Kendall*, 274 Kan. 1003, 1010, 58 P.3d 660 (2002), and paraphrased part of its holding as follows:

> "In other words, to 'operate' means to 'drive'; 'driving' requires movement of the vehicle; therefore, 'operating' requires movement of the vehicle, and an 'attempt to operate' means to attempt to move the vehicle. Taking actual physical control of the vehicle is insufficient to attempt to operate that vehicle without an attempt to make it move." *Darrow*, 304 Kan. at 714.

Here, the issue comes to us following the ruling on a motion to suppress evidence, not after a conviction at trial. Thus, the State does not enjoy the benefit it has in most criminal appeals of having the evidence viewed in the light favoring the State. Here, the

7

State bears the burden of proving the lawfulness of its search and seizure. See *Reiss*, 299 Kan. at 296.

The State has not established reasonable suspicion of criminal conduct. There was no evidence that Bluthardt operated or attempted to operate the car. Breidenstein testified that he never saw the vehicle being driven, nor did he have any reports that it had been driven. Bluthardt made no effort to move the car. Breidenstein lacked any reasonable suspicion that Bluthardt "was attempting to operate a motor vehicle." In *Reiss*, the defendant was seen actually driving a pickup. The court held that once the officer requested the defendant's driver's license the encounter became "an investigative detention." 299 Kan. 291, Syl. ¶ 7. But simply driving or being seen in the driver's seat of an automobile does not provide reasonable suspicion to request identification absent "reasonable suspicion of criminal wrongdoing." 299 Kan. 291, Syl. ¶ 7.

The other grounds claimed by the State to provide reasonable suspicion, *i.e.*, the unbuttoned pants and Department of Corrections ID, together with Bluthardt's admission that she had been convicted of a felony, all became known to Breidenstein after the investigatory detention had commenced. See *Reiss*, 299 Kan. 291, Syl. ¶ 7; *Gonzales*, 36 Kan. App. 2d at 458; *State v. Grace*, 28 Kan. App. 2d 452, 458, 17 P.3d 951 (2001).

As the district court noted, the observation of a firearm alone in the car did not provide reasonable suspicion of criminal activity. The investigatory detention began with Breidenstein's request for driver's licenses. The investigation included extensive questioning of Bluthardt and checking for any outstanding warrants against her. Breidenstein's after-the-fact observations about the unzipped pants and Bluthardt's prior criminal conviction cannot be bootstrapped into being support for asking for the driver's licenses in the first place. When Breidenstein asked for Bluthardt's identification, there was no reasonable suspicion that a crime had been, was currently being, or was about to occur at the time Bluthardt was detained.

8

There being no justifiable basis for the investigation after the safety check was concluded, the search of the car that followed was an illegal search. Accordingly, we find no error in the district court's decision to suppress the evidence obtained in the search of the car.

Affirmed.