NOT DESIGNATED FOR PUBLICATION

No. 120,502

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TORY BLYTH,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed June 12, 2020. Affirmed.

*Megan L. Harrington*, of Overland Park, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and BUSER, JJ.

PER CURIAM: Tory Blyth appeals her convictions for driving under the influence of alcohol (DUI) and related offenses. She contends the district court erred by denying her motion to suppress incriminating evidence obtained as a result of an illegal public safety stop. Upon our review, we conclude the law enforcement officers involved in the traffic stop had objective, specific, and articulable facts to suspect that Blyth needed help, or was in peril, and that the officers took appropriate action to render assistance. Accordingly, the district court did not err in denying the motion to suppress evidence, and the convictions are affirmed.

1

FACTUAL AND PROCEDURAL BACKGROUND

At about 3 a.m. on June 5, 2017, Johnson County Sheriff's Deputies Bradley Newson and Rachel Cutshaw observed Blyth's motor vehicle driving southbound through a rural intersection in southern Overland Park. The deputies were stopped in their patrol vehicle at a stop sign when Blyth's vehicle traveled through the intersection. Shortly thereafter, the deputies turned onto the roadway and went in the same direction as Blyth.

About a 1/4 mile down the road, the deputies saw Blyth's vehicle, with its headlights on and the engine running, stopped beside the roadway in the grass. The deputies activated their patrol vehicle's emergency lights, stopped behind Blyth's vehicle, and approached it. Blyth did not move her vehicle. Prior to this stop the deputies did not observe Blyth commit any traffic violations.

Upon approaching the vehicle, Deputy Newson went to the passenger side door, knocked on the window, and asked Blyth if she was alright. Blyth responded she was fine but she was lost. At this time, Deputy Newson noticed open containers of alcohol in the center console and on the floorboards. When Deputy Cutshaw approached Blyth at the driver's side window, she noticed that Blyth's eyes were droopy, her speech was slurred, and there was an odor of alcohol coming from inside the vehicle. At this point, what ostensibly began as a public safety stop transitioned into an investigatory stop.

Based on the investigation, Blyth was charged with DUI (third offense) in violation of K.S.A. 2016 Supp. 8-1567, driving without an ignition interlock device in violation of K.S.A. 2016 Supp. 8-1017, driving without a valid driver's license in violation of K.S.A. 2016 Supp. 8-235, and transporting an open container in violation of K.S.A. 2016 Supp. 8-1599.

Blyth filed a motion to suppress evidence, claiming the deputies did not have a reasonable suspicion that she had committed any traffic violation or crime to justify the traffic stop. The State countered that the deputies did not violate the Fourth Amendment to the United States Constitution because the evidence seized was the result of a lawful public safety stop.

A hearing on Blyth's motion to suppress occurred on January 26, 2018. At that hearing, Deputy Newson testified. By agreement of the parties, prior preliminary hearing testimony by Deputy Newson and Deputy Cutshaw was also considered by the district court in ruling on the motion.

After considering the evidence, the district judge denied Blyth's motion to suppress evidence, stating:

> "I believe the facts from this case and trying to assimilate the case law, there's no question the safety stop, there's a basis for that. . . .
> "The *Schuff* case [*State v. Schuff*, 41 Kan. App. 2d 469, 475, 202 P.3d 743 (2009)] is probably most closely aligned here in that specific area, a specific isolated area, early in the morning hours, dark out, remote, car parked off the paved road next to a field in a rural area, and clearly the officer was stopping the vehicle not as an investigative matter but as a welfare check or public safety check.
> "I believe that all of that and the approach taken by the deputy in first encountering Ms. Blyth was not investigative, but immediately seeing the open containers or the containers of liquor changed that at that point."

Blyth preserved her objection to the district court's adverse ruling during and after trial. Blyth was found guilty as charged following a jury trial and was sentenced to a controlling sentence of 12 months' imprisonment and a fine of $1,750. Blyth was ordered to serve 10 days in jail and 2,160 hours on house arrest towards that sentence, followed by 12 months of postimprisonment supervision. Blyth appeals.

On appeal, Blyth argues the district court erred in denying her motion to suppress and that her convictions should be reversed because they were based on evidence seized in an illegal public safety stop. Blyth presents a two-fold argument. First, she asserts the deputies did not provide specific and articulable facts to justify a public safety stop. Second, she argues that the use of emergency lights on the patrol vehicle constituted an illegal seizure because no individual would feel free to leave.

Our standard of review in considering a district court's ruling on a motion to suppress has two components. The appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion, however, is reviewed using a de novo standard. In reviewing the factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses. *State v. Neighbors*, 299 Kan. 234, 240, 328 P.3d 1081 (2014).

When the material facts supporting a district court's decision on a motion to suppress evidence are not in dispute—as in this appeal—the ultimate question of whether to suppress evidence is a question of law over which an appellate court has unlimited review. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). The State has the burden to prove that a search and seizure was lawful. *State v. Ton*, 308 Kan. 564, 568, 422 P.3d 678 (2018).

There are generally four types of encounters between individuals and police: (1) voluntary or consensual encounters, (2) investigatory detentions, (3) public safety stops, and (4) arrests. *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016). In this appeal we are only concerned with whether the encounter was a valid public safety stop. As Blyth candidly acknowledges on appeal: "There is little dispute to the facts in this case

and there is no contention that once contact was made, the deputy was [not] permitted to investigate further due to the open container. All focus is on the stop."

Generally, public safety or community caretaking reasons may justify an encounter between an individual and police even when no civil or criminal infractions have occurred, so long as the encounter is based on objective, specific, and articulable facts. *Hanke*, 307 Kan. at 827-28. A public safety stop must be "'divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *State v. Messner*, 55 Kan. App. 2d 630, 631, 419 P.3d 642 (2018) (quoting *City of Topeka v. Grabauskas*, 33 Kan. App. 2d 210, 214-15, 99 P.3d 1125 [2004], and *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 [1973]). "In applying the public safety rationale to justify a police-citizen encounter, courts employ careful scrutiny 'so the protections of the Fourth Amendment are not emasculated.'" *State v. Weaver*, No. 119,956, 2019 WL 2147678, at *7 (Kan. App.) (unpublished opinion) (quoting *State v. Gonzales*, 36 Kan. App. 2d 446, 455, 141 P.3d 501 [2006]), *rev. denied* 310 Kan. 1071 (2019).

In evaluating the legality of a public safety stop, our courts employ a three-part test:

> "First, the officer has a right to stop and investigate as long as there are objective, specific, and articulable facts from which a law enforcement officer would suspect that a citizen is in need of help or is in peril. Second, the officer may take appropriate action to render assistance if the citizen is in need of aid. In order to render this assistance, appropriate action has been held to include an officer blocking a vehicle's entrance back onto the road and an officer activating his emergency lights to make initial contact with the vehicle. Third, once the officer is assured that the citizen is not in need of help or is not in peril, any actions beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment to the United States Constitution. [Citations omitted.]" *State v. Morales*, 52 Kan. App. 2d 179, 182-83, 363 P.3d 1133 (2015).

5

As stated above, a law enforcement officer must provide specific and articulable facts that he or she suspects the citizen needs assistance. The State argues the deputies provided a sufficient factual basis to justify a public safety stop. Upon our review, we find substantial competent evidence to support the deputies' suspicion that Blyth needed assistance. Considered together, the following facts are relevant:

- The time of the encounter was 3 a.m. on a dark and foggy stretch of roadway without streetlights and resulting in low visibility.
- The location of the vehicle was an isolated rural area, with hilly terrain, next to a field with no businesses or houses nearby.
- Shortly before observing the vehicle off the side of the roadway with its headlights on and engine running, the deputies had seen the vehicle traveling normally down the roadway.
- The vehicle had traveled off the two-lane roadway and stopped completely on an adjacent grassy area. In particular, Deputy Newson stated it was uncommon to see a vehicle stopped where there is no shoulder, and only grass on either side of the roadway.

Under these circumstances, Deputy Newson testified that "we wanted to make sure it wasn't an emergency situation for medical reasons or an accident, a car-deer, or something like that." Similarly, Deputy Cutshaw testified, "I wasn't sure if she was okay or what exactly we had at the time."

In concluding that the deputies were justified in conducting a public safety stop, the district court surveyed relevant Kansas caselaw, including *State v. Schuff*, 41 Kan. App. 2d 469, 475-76, 202 P.3d 743 (2009), *Nickelson v. Kansas Dept. of Revenue*, 33

6

Kan. App. 2d 359, 365, 102 P.3d 490 (2004), and *State v. Morris*, 276 Kan. 11, 18, 72 P.3d 570 (2003). As noted earlier, the district court found *Schuff* to be persuasive precedent given the similarity of its facts to this case on appeal.

In *Schuff*, an officer was dispatched to the area after a call was received from a citizen who reported that Schuff had driven through a dead-end road and into a creek. The responding officer located a vehicle in a remote area parked off a paved road next to a field. The engine was not running, and the vehicle lights were turned off. Our court found the following specific and articulable facts supported the public safety stop:

> "(1) [the officer] had been dispatched to the area specifically to check on the welfare of a white car which had driven off the road, (2) it was just before 1 a.m., (3) the car was in a remote area, and (4) the car was parked off the paved road next to a field." 41 Kan. App. 2d at 475.

In upholding the officer's actions as a lawful public safety stop, our court reasoned that the officer did not have to observe an emergency or an immediate need for assistance in order to check on the welfare of the occupants of the vehicle:

> "The fact that it was late at night and the car was in a remote area parked off the paved road next to a field provided sufficient justification for [the officer] to *suspect* that a citizen was in need of help or was in peril, especially in light of the phone call from a citizen to check on the welfare of the occupants of the car." 41 Kan. App. 2d at 476.

*Nickelson* also provides helpful precedent. In *Nickelson*, the driver drove his vehicle off the highway at 1 a.m. into a "'farm plug' or driveway. . . . After turning into the driveway from Highway 24, Nickelson turned off the vehicle's lights. The weather was cold but clear." 33 Kan. App. 2d at 360. There were no farm buildings, businesses, or other residences in the area. The trooper testified that he did not observe any traffic infractions, but he was concerned that Nickelson might be in distress because he had

7

turned into the "'middle of nowhere'" and turned off the vehicle lights. 33 Kan. App. 2d at 361. Upon contacting the driver, the trooper immediately smelled alcohol.

Our court in *Nickelson* found that the trooper provided specific and articulable facts to warrant a public safety stop. In part, we noted that the trooper operated under a Kansas Highway Patrol policy that provided that a trooper should always check on the welfare of any vehicle on the side of the highway. The trooper also testified that if somebody has pulled off the side of the road, "he always checks on them." 33 Kan. App. 2d at 365.

*Schuff* and *Nickelson* share many similarities with Blyth's case. The three cases involve a vehicle inexplicably stopped beside a rural highway in a remote area, late at night. No traffic infractions were noted in any case. The law enforcement officers testified they were concerned about the drivers' welfare at the time of the encounters. Similar to *Nickelson*, in Blyth's case, Deputy Newson testified that it was his practice to never drive by a vehicle on the side of the road without investigating to make sure everything was alright. *Schuff* and *Nickelson* provide valuable precedent that the deputies' encounter with Blyth was justified as a public safety stop.

Blyth counters that the facts of her case are "more akin" to *Morales* than to *Schuff* and *Nickelson*.

In *Morales*, our court found a traffic stop was not justified as a public safety stop when an officer's reasons for making the stop were primarily investigative. In *Morales*, an officer was at an intersection in a rural area at 2:30 in the morning when he spotted a vehicle stopped on the side of the road with its headlights on. The officer testified that because the vehicle was on the side of the highway in the early morning hours and in a remote area, he was concerned the vehicle had broken down. The officer did not witness the vehicle commit any traffic infractions, but he was suspicious because of the vehicle's

8

location. When the officer pulled behind the vehicle, he saw two persons enter the vehicle and saw the vehicle brake lights activate. The officer then activated his emergency lights to contact the driver because he thought he was attempting to drive away.

At the suppression hearing, the officer testified that he operated under the Reno County Sheriff Department's community caretaking policy, which had two prongs: (1) to check on vehicles that are parked alongside of the roadway or abandoned to make sure that everything is alright or that the individual is not having mechanical problems, and (2) if the vehicle is in a rural area, to make sure the vehicle is not stolen or part of some other crime.

Our court in *Morales* found that the officer was operating under the second, investigatory prong rather than the first prong because the officer testified that he was suspicious of the vehicle given its location and time due to recent irrigation thefts occurring in the area. 52 Kan. App. 2d at 185. From *Morales*, our court established this point of law: "A public safety stop is to be totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 52 Kan. App. 2d 179, Syl. ¶ 4.

*Morales* is distinguishable as to the relevant law and facts. Unlike *Morales*, in this case there was no evidence to suggest that the deputies were engaged in the detection or investigation of crime at the time of their encounter with Blyth. On the contrary, the video recording of the stop shows that Deputy Newson approached the vehicle on the passenger side, knocked on the window, and immediately asked Blyth, "Are you okay?" *Morales* has no precedential application given these facts and circumstances.

In summary, the district court did not err in its conclusion of law that the deputies were engaged in an appropriate public safety stop rather than a criminal investigation when they initially encountered Blyth.

9

Under the second prong of the public safety stop test, law enforcement officers must take appropriate action when rendering assistance to a vehicle. "[A]ppropriate action has been held to include an officer blocking a vehicle's entrance back onto the road and *an officer activating his emergency lights to make initial contact with the vehicle*." (Emphasis added.) *Morales*, 52 Kan. App. 2d at 182-83. Blyth argues that—assuming the officers presented sufficient facts to support a public safety stop—the activation of the full emergency lights was a show of authority to which a reasonable person would not feel free to leave.

In support of her argument, Blyth cites to *Morris*. In *Morris*, officers were investigating a possible methamphetamine lab at an apartment in Eudora when they observed a woman leave the apartment in a vehicle. The officers followed the woman as she drove to Lawrence where she stopped and spoke to Morris seated in pickup truck. The vehicles left the area. The officers next located Morris' truck about two hours later, parked with the engine running, at a jetty breaker near the Douglas County State Lake. After backup officers arrived, the officers stopped their vehicle behind Morris' pickup "'and activated the red lights and illuminated the back of his pickup with . . . spotlights.'" *Morris*, 276 Kan. at 13. Upon their approach, the officers noticed a chemical odor associated with the manufacture of methamphetamine coming from inside the truck. A subsequent search of the truck revealed illegal drugs and items used in the manufacture of methamphetamine.

On appeal, one of Morris' suppression issues was that the police officers had illegally seized him without reasonable suspicion when they pulled up behind his parked vehicle and activated their emergency lights. Our Supreme Court agreed that the encounter was not voluntary but occurred under a show of authority. 276 Kan. at 20.

10

However, the Supreme Court distinguished this particular activation of emergency equipment with other situations involving the use of emergency equipment:

> "We do note that some courts have held that activation of emergency lights is not a seizure because the lights may be activated for safety reasons. See *United States v. Dockter*, 58 F.3d 1284, 1287 (8th Cir. 1995) (no behavior by officer to differentiate encounter from one where officer approaches stranded motorist to offer assistance), and *State v. Baldonado*, 115 N.M. 106, 110, 847 P.2d 751 (1992) (manner in which police officers approach car after it has been stopped in response to officers' use of their emergency lights is controlling for purposes of determining whether stop is 'seizure' that would require probable cause or reasonable suspicion; trial court should ordinarily find 'seizure' if officers approach in accusatory manner, asking for license and registration and account of occupants' activities, while 'seizure' should ordinarily not be found if officers approach in deferential manner and ask first whether occupants need help).
>
> "In this case, no such question arises because Morris was parked in a jetty area of the Douglas County State Lake where a reasonable person would not believe that the lights had been activated for safety reasons. There was no showing that other traffic necessitated activating the emergency lights. Thus, we do not reach this question." 276 Kan. at 23-24.

Returning to the case on appeal, the district judge expressly considered and distinguished *Morris* regarding the activation of emergency lights:

> "Counsel, there's a fine line, I think, in handling of all this when not having any policy or any real reason for why the front lights were turned on instead of just the back lights.
>
> "Officer stated it was for officer safety in a dark, remote area on a foggy night at 3:00 in the morning. And quite frankly, Officer Newson stated he could have activated the rear lights only. No specific reason why he had done that.
>
> "But, actually, in looking at the *Dockter* case, I think this is where the [Supreme] [C]ourt is leading us because *Morris* isn't exactly on point, again, because it's not a public safety stop in looking at that. But in *Dockter*, there's a finding that the lights being turned

11

on was not a seizure under the Fourth Amendment when the officer in that case pulled behind the defendant's vehicle and activated his amber warning signals or warning lights.

"And then the Court looked at the time of that encounter, the two cars were the only vehicles in the area. There's only one law enforcement officer, or in this case, one vehicle on the scene. In that case, he did not block the appellant's vehicle or in any manner preclude them from leaving, did not draw his weapon, and his tone of voice was inquisitive, which is what they go back to—he didn't come up and immediately say, give me your driver's license and insurance or step out of the car. It was more, can I assist you; is there something wrong?"

We think the district court's analysis was sound. *Morris* did not involve a public safety stop. The Supreme Court in *Morris* specifically noted that emergency lights may be activated for safety purposes. Accordingly, *Morris* itself recognized that a seizure is dependent upon a weighing of various factors, not simply whether the emergency lights were activated. See *State v. Thompson*, 284 Kan. 763, 808, 166 P.3d 1015 (2007) (citing *Morris* and stating "[c]onsidered as part of the totality of the circumstances, the presence or absence of emergency lights may or may not be significant; emergency lights may signify different meanings under different circumstances").

Here, Deputy Newson testified that he activated his emergency lights for safety purposes because it was dark and foggy with no streetlamps which resulted in low visibility. The deputy testified that his purpose was to warn oncoming traffic traveling on the roadway in both directions. Although Deputy Newson testified that he could have activated only the rear lights, doing so would not allow him to activate the front lights at the same time.

Moreover, unlike *Morris*, the two-lane paved roadway was an area with traffic rather than a remote area without traffic such as a jetty area. The video recording of the stop shows multiple cars driving along the opposite side of the road during the time that the deputies conducted the stop.

12

In addition, Deputy Newson testified that the patrol vehicle pulled in behind Blyth's vehicle and did not block her from leaving. There was no command from the deputies to halt, an attempt to control the ability to flee, or a display of a weapon during the initial approach of the vehicle. Deputy Newson testified that had he not observed any open containers, he would have helped Blyth with whatever problem she had, whether she was lost or injured, and sent her on her way. And, if Blyth did not want to speak with Deputy Newson, he would have walked away because she would have been free to go.

Upon our review, the district court did not err in its conclusion of law that the deputies' activation of emergency lights under the circumstances was for safety purposes and did not constitute an illegal seizure for purposes of the Fourth Amendment.

Finally, for the sake of completeness, we note that Blyth does not argue that the deputies' actions violated the third prong of the public safety stop test—that once the officer is assured that the citizen is not in need of help or is not in peril, any actions beyond that constitute a seizure, implicating the Fourth Amendment to the United States Constitution. See *Morales*, 52 Kan. App. 2d at 183.

Affirmed.